Roger A. Hoekstra, Plaintiff-Appellee, *v.* The City of Wheaton, Defendant-Appellant.

(No. 73-103;

Second District (2nd Division)—February 5, 1975.

*Rehearing denied March 5, 1975.*

Gerald J. Brooks, of Naperville, and Donovan, Dichtl, Atten, Mountcastle & Roberts, of Wheaton, for appellant.

Peregrine, Stime & Henninger, of Wheaton, for appellee.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

This is an appeal from the judgment of the circuit court of Du Page County declaring the zoning ordinance of the City of Wheaton invalid as applied to the plaintiff's property.

The property in question is a 5.5-acre parcel of land within the city limits, roughly rectangular in shape and containing 21 lots. It is bisected by a residential improved street (Cole Street). There are single-family residences to the north, east and southwest of the property. Wheaton North High School adjoins the property on the west, and Wheaton Park District owns the land to the southeast except for an intervening vacant tract. A dog kennel and a stable, both nonconforming uses, are located adjacent to the northwest corner of the property. The topography slants from west to east. A drainage swale cuts across the property, running roughly from northwest to southeast to the eastern edge of the property, then along the eastern edge south to Cole Street, thence to a culvert and along the south border of the property. This swale varies in depth from a few inches to some 12 feet as it continues from northwest to southeast.

The plaintiff purchased the 5.5-acre tract in 1970 for $140,000 from a Dr. Tilliman who had owned it since 1956. At that time the property was unimproved, but streets, sewer and water were installed in 1967 following its annexation to Wheaton. The property is zoned R-3 single-family residential with a minimum lot size of 10,000 square feet.

Following his purchase of the property the plaintiff employed one Walter Edgar Green, Jr., an architect with a minor degree in land planning, to prepare a land-development plan for the property. Mr. Green testified he discussed the project with Mr. Murphy, city planner of the City of Wheaton, and showed him some tentative plans for the proposed development. Mr. Murphy testified that his function was to "assist" prop-

erty owners who had vacant property which they wished to develop, and to this end he discussed problems inherent in the property and reviewed tentative plans for its development with Mr. Green. Mr. Green testified that he told Murphy that Dr. Hoekstra wished to develop the property according to the R-5 multifamily standards and requirements under the Wheaton zoning ordinance, including the R-5 standards as to density. He was under the impression that Murphy never objected to the R-5 concept; however, Murphy testified he did object to the density which could be developed in the project under R-5 standards and indicated a minimum of 8 units per acre would be more compatible with the city's wishes than the 13 or 14 units theoretically possible under R-5 zoning. Murphy referred to the Wheaton Comprehensive Plan as indicating the maximum density of 8 living units per acre in a multifamily project under R-5 zoning.

Whatever the fact is as to the amount of conversation on the point of density of population in the proposed development and whatever density was indicated by Murphy as being satisfactory, the plan as finally presented to the Wheaton City Council was a planned unit development of 72 living units, not permitted under R-3 zoning but requiring a change in zoning to R-5 under the Wheaton zoning ordinance.

In his report to the city council on the proposed plan of development, Murphy, the city planner, conceded that the feasibility of the proposed use of the site was "excellent," whereas there would be difficulties with the development as single-family lots. He recommended that the petition for a change of zoning be denied "at this time and further study of the proposal be pursued by the city and developer in order to arrive at acceptable resolutions of the outstanding questions of density, architectural treatment, ingress, egress, traffic and unit distribution." The city council, upon being presented with the plan, disapproved it and denied plaintiff's petition, and the present declaratory judgment suit followed. The plaintiff asked in this suit that the Wheaton zoning ordinance be declared null and void in its application to the plaintiff's property and that the city be restrained from interfering with plaintiff's construction and operation of a planned unit development of 72 multifamily units on the said premises.

There was a great deal of testimony as to the difficulties of the terrain —affecting some of the lots—and other adverse factors such as the nearby kennel and stable and the proximity of Wheaton North High School and its traffic. There was also considerable speculation as to the cost of remedying the drainage problems of the property. All of this evidence appears to boil down to this; that the plaintiff was aware of the zoning

classification and also of the defect inherent in the property from a single-family residence standpoint when he bought the property, that the property could be more profitably developed as a Planned Unit Development than as separate homesites for single-family residences, that the city's main objection to the proposed development is that the comprehensive plan for the city calls for a lower density—around 8 units per acre—in this area, that there may be some traffic problems created by the development at certain hours but not significantly more than under single-family development, and that on the whole there would be little or no adverse affect on the character of the surrounding area by reason of the proposed development.

It is apparent that the differences between the plaintiff and city are very narrow in scope—essentially a question of density of the proposed living units. The city's position, however, is weakened by the city planner's acknowledgment that the present zoning classification is inadvisable due to certain factors such as the high volume of high school traffic, the drainage problem of some of the lots and the proximity of the kennel and stables and his consequent recommendation that a Planned Unit Development be permitted.

Moreover, since the Wheaton zoning ordinance permits a planned unit development to have a maximum density somewhat in excess of the proposed plan, the plaintiff contends that the city cannot decline the petition on the ground of excessive density, since the city concedes that a planned unit development is more feasible than the present single-family classification for this site.

■■  Opposed to these arguments in the plaintiff's favor, the city points out that a municipal zoning ordinance has a presumption of validity and is not to be overthrown even as respects a particular piece of land, merely because another zoning classification might be more logical. (*Chicago Title & Trust Co. v. City of Chicago* (1970), 130 Ill.App.2d 45.) Moreover, density is a legitimate concern in a zoning case and an adequate basis for classification (*Cosmopolitan National Bank v. Chicago* (1961), 22 Ill.2d 367), but in this case Mr. Murphy, the city planner, not only admits the merit of the multiple-dwelling concept—he actually recommends that the concept be adopted for the property in question and admits the undesirability of the present R-3 classification. As to the objection of density, which appears to be the city's main objection to the project as proposed by the plaintiff, the evidence was both sparse and unconvincing. In speaking of the traffic which might be generated by the 72 dwelling units as compared with the existing traffic, most of which is generated by the high school—Mr. Murphy acknowledged the traffic

would only be increased "slightly" and that "the amount of traffic out of multiple family units is fairly low ratio as compared to a single family." Mr. Neuses, the city's expert real estate witness, testified that in his opinion it was "pretty much of a toss-up" as far as safety was concerned between the traffic which would be generated from single-family lots and that which would be generated by the proposed 72 dwelling units under the multiple-dwelling plan proposed by the plaintiff.

While the question of drainage was given some attention in the testimony, there was no definite showing that the proposed development would increase the problem as compared with the development of the site as single-family lots—it was a problem either way, and while Mr. Murphy testified that "it is possible on a lower density land use development to accomplish the surface drainage of this water rather than piping it through pipes," no definite conclusion was reached as to whether or how this could be accomplished. This was too tentative to be considered as evidence supporting the city's rejection of the petition based on the increased drainage problem. Drainage was a problem whether developed as a multiple-dwelling project or as single-family residences, and this is indicated in Mr. Murphy's report to the city council of March 17, 1972, wherein he cites the drainage problems on certain lots as a reason for recommending the site for development of a planned unit development.

Throughout Mr. Murphy's testimony it is apparent that the city's objections to the proposed development are based more on the standards of the city's Comprehensive Plan—which called for a maximum of 8 dwelling units per acre under R-5 zoning—than on any question directly bearing on the health, safety or convenience of the community. By implication it was conceded by Mr. Murphy that the present zoning of R-3 does not represent the highest and best use of the land, since he recommended a different zoning.

■■  Even though the present zoning classification does not represent the highest and best use of the land in question this is not a basis for finding it invalid, *Chicago Title & Trust Co. v. City of Chicago* (1970), 130 Ill.App.2d 45, but in order to sustain its validity in a case where another use of the land is clearly more appropriate, it does have to be shown that the restriction is reasonably related to the public health, safety or morals. (*La Salle National Bank v. Village of Harwood Heights* (1971), 2 Ill.App.3d 1040.) This is, of course, especially true where the loss to the owner of the land is much greater than the benefit to the public. In *Mobil Oil Corp. v. City of Rockford* (1972), 8 Ill.App.3d 649, this court said at page 654:

> "The record affords no evidence to show that a substantial public interest would be served by denial of the proposed use. Where the public gain is small compared to the hardship imposed on the property owner, the presumption of the validity of the ordinance will be overcome."

The testimony in the case before us does not indicate there would be any substantial gain to the public in continuing the present zoning classification. The impact on the surrounding neighborhood, considering the likelihood that the property will otherwise remain wholly or partially vacant, is likely to be more beneficial than adverse. The property has been vacant for a long period of time under the present zoning classification and some housing starts there have been abandoned. It is not, obviously, a matter of public concern therefore to continue the present classification. Of three neighbors who testified on this point, two did not anticipate any adverse affect on their own property from the proposed project.

■■ It is our opinion, therefore, that the presumption of the validity of the ordinance as to this particular tract of land has been overcome because of:

(a) The consensus that the present zoning classification is not the highest and best use of the land; (b) the lack of any evidence that the proposed change in classification would adversely affect the surrounding community; (c) the disproportion between the gain to the public and the loss to the property owner in maintaining the present zoning, and (d) the city's failure to show that the retention of the present zoning classification is required for the public health, safety or convenience.

Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Judgment affirmed.

T. MORAN and DIXON, JJ., concur.