RICHARD GEORGEN *et al.*, Plaintiffs-Appellees, *v.* THE VILLAGE OF MOUNT PROSPECT, Defendant-Appellant.—(WEDGEWOOD TERRACE HOMEOWNERS ASSOCIATION, Intervening-Defendant.)

First District (3rd Division) No. 77-125

Opinion filed October 18, 1978.

Jack M. Siegel, of Chicago, for appellant.

Gordon, Schaefer & Gordon, Ltd., of Chicago (Robert E. Gordon, of counsel), for appellees.

Mr. JUSTICE SIMON delivered the opinion of the court:

This appeal stems from a declaratory judgment action by the plaintiffs, Richard Georgen (Georgen), and Poppin Fresh Pies, Inc. (Poppin), alleging that single-family residential zoning applicable to a parcel of real estate consisting of four lots owned by Georgen in the Village of Mount Prospect (the Village) was unreasonable and void. The plaintiffs sought an order permitting Poppin, a restaurant chain which is the contract purchaser, to construct a 3,900-square-foot restaurant on part of the subject property, and to use the balance of the property generally for business purposes. The proposed restaurant site would cover two of the lots and a portion of a third; no specific use was proposed for the balance of the third lot and the fourth lot (the remaining portion of plaintiffs' property). The village's zoning board of appeals' recommendation that the plaintiffs' application for rezoning be denied was followed by the board of trustees. The plaintiffs then filed this action, which was contested by the village and an intervening defendant, the Wedgewood Terrace Homeowners Association (the Association), representing homeowners in the area surrounding the four lots.

After a full hearing in which the Association participated, the trial judge entered an order declaring that the Village's zoning of the subject property for single-family residence use was invalid. The order permitted Poppin to build its proposed restaurant without interference by the Village, and allowed it to use the remaining portion of the plaintiffs' property for any activity permitted under the Village business zoning classification.

The property in question is a rectangular parcel of approximately 81,400 square feet located on the east side of Rand Road at the northwest corner of its intersection with Wedgewood Lane. Rand Road is a four-lane divided State highway with a median running in a northwest direction; Wedgewood Lane is a local, blacktopped street running southwesterly. The parcel is part of a large triangular residential area (the Wedgewood triangular area) bounded by Rand Road on the south and west, Euclid Avenue—a four-lane road—on the north, and Elmhurst Road, a four-lane highway, on the east. The parcel has a frontage of 400 feet on Rand Road.

The Wedgewood triangular area consists entirely of property zoned for single-family residential use, except for a small parcel at the southeast corner where Rand and Elmhurst Roads intersect, and another small portion at the northwest corner, in Arlington Heights, where Euclid Avenue meets Rand Road. The parcel at the southeast corner is a retail

and service district and has a furniture store, a fast-food restaurant and a gas station. The subject property is separated from this parcel by Wedgewood Lane and seven residential lots. The parcel at the northwest corner also has some small business uses; it is approximately 1,400 feet on Rand Road from the subject property. Wedgewood Lane is one of two principal roads in the Wedgewood triangular area and the only road running through it which exits on Rand Road. The Wedgewood triangular area has narrow macadam streets, no sidewalks and open-ditch drainage. It has about 90 single-family homes.

Two of Georgen's lots are vacant, while the other two contain single-family homes constructed in the middle 1950's. The homes are one story in height, with brick construction and detached garages. Immediately behind the subject property going away from Rand Road and along the north line of the subject property, as well as to the east of the subject property and across Wedgewood Lane to the south, are substantial single-family homes, many of them located on ½-acre parcels. To the northwest of Georgen's property is a private residence fronting on Rand Road, where the owner and occupant sharpens and repairs lawn mowers by appointment only. He has no signs on his property advertising his lawn mower business.

Directly across from the subject property on the west side of Rand Road there is an automobile sales agency in an area zoned as a business retail and service district. A shopping center, miniature golf course and baseball-hitting range are directly southeast of the auto agency. The land northwest of the agency is zoned for single-family residential use. Randhurst, a major shopping center, commences on the east side of Elmhurst Road and is separated from the subject property by many single-family residences.

A Poppin restaurant has a full-service limited menu, is open from 11 a.m. to 11 p.m. and features pies, including take-home pies, soup, salads and sandwiches. It is a sit-down restaurant with a capacity of 136 to 138, employing waitresses and keyed into a commissary which guarantees daily delivery of food and pies. Seventy-five parking spaces were planned for the restaurant, 36 more than required by the Village ordinance. The proposed restaurant was to have two major access points to the parking area from Rand Road and one from Wedgewood Lane. Five restaurants which offer a short-order menu similar to a Poppin restaurant are located within 1¾ miles from the proposed site. However, the Poppin real estate manager testified that there were many differences between the existing restaurants in the area and a Poppin establishment.

One of the plaintiffs' witnesses, a planning and zoning consultant, testified there was a need for a Poppin restaurant in the area. The owner of the lawn mower sharpening business referred to above also testified he felt a need for such a restaurant. A neighbor of the lawn mower sharpener

testified she would like to have a new restaurant in the neighborhood, although she never has eaten at a Poppin restaurant. She did not think that such a restaurant would have any adverse effect on properties in the area. Three other homeowners who lived on the opposite side of Rand Road and two who lived on the same side as the subject property testified they would have no objection to the proposed restaurant. However, a large number of residents of the Wedgewood triangular area called as witnesses by the Village opposed the restaurant. In general, they feared that it would depreciate their property values and attract additional traffic through their streets presenting a safety hazard to the numerous children and adults who play, walk or ride bicycles along those streets. They added that there is no difficulty in finding adequate restaurants in the Mount Prospect-Arlington Heights area.

The plaintiffs' expert witnesses supplied the following testimony. The highest and best use of the property would be for B-3 or B-4 commercial uses, including the specific proposal for a Poppin restaurant. One of the plaintiffs' experts, a planning and zoning consultant, testified that it was not feasible to develop Georgen's property for single-family homes. The plaintiffs' real estate expert conceded, however, that there is a need in the area for single-family residences, that there is sufficient lot area for residences, and that although it would be difficult to market such residences, it could be done.

On the west side of Rand Road, opposite the subject parcel, the Village has zoned for commercial use property contiguous to single-family areas, and the plaintiffs' experts expressed the opinion that both the business and residential uses have existed without a depreciatory effect. In addition, the plaintiffs' experts testified that the trend of development on Rand Road is "going more toward intensive commercial developments." About the only things that break up the commercial development are a few interspersed residences and two golf courses at Euclid Avenue. Otherwise it is essentially a commercial street from Palatine all the way down to Des Plaines. The site planned for the Poppin restaurant would not have an adverse effect on adjoining or nearby properties even if traffic through the Wedgewood triangular area increased. Neither would the remaining portion of the plaintiffs' property have such an adverse effect even if it were developed with any use permitted under the B-3 zoning classification. The restaurant improvements would increase the value of adjacent homes, particularly because of landscaping planned for the rear line of the restaurant property. That landscaping would include a 10-foot bicycle path, a public sidewalk to be constructed on Wedgewood Lane and a proposed fence treatment approximately 8 feet high along the rear lot line. The Village's comprehensive plan designates the subject property as single-family, but the Village has consistently granted rezoning contrary to its plan.

The plaintiffs' zoning and planning expert testified on direct examination that the Wedgewood triangular area contained approximately 45 acres, but on redirect his testimony was that it contained almost 55 acres.

The plaintiffs' experts also testified that a 1975 traffic count showed Rand Road carried 21,700 vehicles on an average daily basis; this makes it a heavily traveled road. A local road such as Wedgewood Lane was used by residents to get to or leave their homes. Based on a traffic count, Wedgewood Lane could be described as very little used. A Poppin restaurant on the subject site would have no effect on the traffic on Rand Road and only a minute effect on the traffic on Wedgewood Lane. The traffic volumes on Rand Road were not so heavy that traffic exiting from or entering the proposed restaurant would affect or endanger anyone. Traffic for the proposed restaurant would come from driveways on Rand Road into the restaurant parking lot, rather than from and to Wedgewood Lane. All of the plaintiffs' experts assumed that automobiles going to or departing from the restaurant would not go through the residential portions of the Wedgewood triangular area.

The value of the subject parcel under its present zoning would be $90,000, apportioned $32,500 to each of the two residences and $12,500 to each of the two vacant lots. With a B-3 zoning classification, which would permit development of any of the commercial uses permitted under that classification, the value of the parcel would be approximately $320,000. The homes located in the residential subdivision in back of the proposed restaurant site range from the low $40,000's to mid $50,000's in value. The two homes on the subject parcel are in a state of disrepair, with peeling paint, broken windows, gutters and sashes, and messy yards cluttered with equipment and automobiles.

Other testimony by the plaintiffs' witnesses referred to a site plan relating to the restaurant's construction which they testified complied with all engineering standards for storm water retention, run-off, sewage and water. To provide such a plan for any single-family homes that might be built on the subject parcel would involve prohibitive costs. These witnesses agreed that the on-site retention plans proposed would not necessarily be adequate for all the uses to which the remaining portion of the plaintiffs' property might be put. They also said that it would not be possible to determine the water retention requirements of the remaining portion of the plaintiffs' property without knowing specifically how it would be used.

Georgen testified that he acquired the first lot in 1958, the next two in 1964, and the fourth in 1968. At these times all the lots were zoned single-family. He said he had the subject property up for sale, subject to rezoning, for 8 to 10 years and that although he was interested in any offer on the property, he wanted his price, whether for commercial use or

single-family use. He would accept an offer from anyone who was willing to pay him his price. Both his homes were rented and the tenants at the time of trial had been occupying the residences for 4 years.

The Village's expert witnesses testified that the restaurant would result in substantial traffic increases on Rand Road at the location of the restaurant. In addition, automobiles traveling to and from the restaurant would be moving in all directions including on Wedgewood Lane. The traffic arriving from the northeast would come through the residential area immediately to the north. The increased vehicular traffic from movement through the Wedgewood triangular area would increase the hazard for children and pedestrians using the streets for walking, playing or bicycle riding; increased movements of cars increase accident probability. The increased traffic would also conflict with vehicles entering and leaving driveways of homes. Without the Poppin restaurant there would be practically no through traffic in the Wedgewood triangular area. The planned width of the restaurant driveways, 24 feet, is too narrow for the high-activity type of use to which the driveways would be put; the minimum width for these driveways should, according to standards developed by the Institute of Transportation engineers, be 30 feet. And the maneuvering space proposed for the parking area was 4 feet tighter than it should be. If single-family homes were constructed on the subject property, several ways to enter from and exit upon Rand Road could be devised.

The Village also produced witnesses who felt it was feasible to develop single-family homes on the subject parcel even in proximity to heavily traveled Rand Road, and pointed out that homes built on heavily traveled thoroughfares in the Chicago area have sold well. Their opinion was that the highest and best use for the subject property from a real estate viewpoint would be single-family residential. They testified that commercial use would have a negative effect on the value of the homes in the vicinity of the proposed restaurant site and because of automobile exhausts, lights and noise, the environment of the properties there would be changed. The proposed restaurant would have a dramatic effect on the first four houses that back up to the proposed restaurant site.

A city planning and zoning consultant, called by the Village as a witness, testified that the residential area surrounding Georgen's property, as well as that within the entire Wedgewood triangular area, was of a very high quality and well maintained and that these homes constituted a quiet, residential area. In his opinion, the Village's comprehensive plan designating substantially all of the Wedgewood triangular area as residential was sound, and the proposed use would constitute spot zoning. He stated that the restaurant would have a serious adverse effect upon the adjoining surrounding properties, setting a precedent for the east side of Rand Road prejudicial to single-family development. He believed the

highest and best use of the subject property was single-family residential because Georgen's property is bounded on three sides by residential uses and on the fourth by a major thoroughfare.

The Village's consultant also testified that the vegetation within the Wedgewood triangular area and the natural features of the development there make the subject property suitable for single-family development. The Wedgewood triangular area is already developed with residences with very few vacant lots left, and with two park sites for children, one site having playground equipment and the other a baseball diamond. The consultant's opinion was that the Wedgewood triangular area was a residential development which should not be intruded upon by a business use, and that a home occupational use, such as the property owner who sharpened lawn mowers in his home, does not affect the general character of the neighborhood.

We conclude that the judgment of the trial court should be reversed because the evidence introduced by the plaintiffs failed to overcome by clear and convincing evidence the presumption of validity of the Village's zoning ordinance as applied to the subject property.

■■ A zoning ordinance should be upheld if it bears any substantial relationship to the public health, safety, comfort or welfare. It is presumed to be valid, and the party attacking such an ordinance bears the burden of demonstrating its invalidity. The challenging party must establish by clear and convincing evidence that the ordinance, as applied to his property, is arbitrary and unreasonable and bears no substantial relation to the public health, safety or welfare. (*Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 179-80, 354 N.E.2d 899; *County of Cook v. Priester* (1976), 62 Ill. 2d 357, 367-68, 342 N.E.2d 41; *Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 110-11, 324 N.E.2d 406.) The rationale for these zoning principles was described in *La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 428, 312 N.E.2d 625:

> "These rules are based upon a recognition that zoning is primarily a legislative function, subject to court review only for the purpose of determining whether the power, as exercised, involves an undue invasion of private constitutional rights without a reasonable justification in relation to the public welfare. [Citations.] *Where it appears,* from all the facts, *that room exists for a difference of opinion* concerning the reasonableness of a classification, *the legislative judgment must be conclusive.*" (Emphasis added.)

■■ The supreme court in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65, noted a number of specific factors to be considered by a court in weighing the validity of a zoning ordinance:

> "(1) The existing uses and zoning of nearby property, [citations],
> (2) the extent to which property values are diminished by the

particular zoning restrictions, [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public, [citations], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner, [citation], (5) the suitability of the subject property for the zoned purposes * * *, and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property."

See *Tomasek*, at 180-81; See also *Duggan*, at 111-12.

■■ In determining the validity of zoning restrictions, a paramount consideration is the extent to which the zoning of the subject property conforms with surrounding existing uses and whether the surrounding uses are uniform and established. (*Ryan v. County of Du Page* (1963), 28 Ill. 2d 196, 198, 190 N.E.2d 737; *Gregory v. City of Wheaton* (1961), 23 Ill. 2d 402, 406, 178 N.E.2d 358.) Here, the predominant use in the immediate area of the subject property as well as in the entire Wedgewood triangular area is single-family. The Wedgewood triangular area has approximately 95 single-family lots, 35 of which face heavily traveled roads. Except for the small pieces at its southeast and northwest points, the Wedgewood triangular area is an enclave of single-family residences, and no compelling reason has been advanced for permitting the introduction of commercial encroachment into the area. Even on the west side of Rand Road, a substantial area is devoted to single-family use. The legislative determination of the Mount Prospect village board to retain single-family zoning—a classification compatible and harmonious with the existing uses and zoning in the Wedgewood triangular area—cannot be characterized as an unreasonable or arbitrary abuse of discretion which warranted the trial court's decision to set aside the legislative judgment.

■ Second, the value of Georgen's property is not unreasonably diminished by the restriction. The trial judge stated that the value of Georgen's property is diminished by the existing zoning because it would be far more valuable if rezoned, but this is not the proper standard for deciding whether a property value has been unreasonably reduced. Although the subject property would be worth substantially more if it could be used for B-3 purposes, this differential in value is a common characteristic in cases of this nature, where a more intense commercial use is sought in lieu of a single-family restriction. (*Tomasek*, at 182; *Ryan*, at 198; *Trendel v. County of Cook* (1963), 27 Ill. 2d 155, 161-62, 188 N.E.2d 668.) The added profit the plaintiffs could reap if successful in striking down the zoning ordinance does not justify a zoning change by judicial intervention. Judicial assistance is not appropriate in the face of a record which fails to show that Georgen will suffer a loss in value if he is

restricted to the single-family use which prevailed when he bought the property.

The plaintiffs argue that the disrepair of the two homes as well as the yards cluttered with equipment and automobiles indicate that the existing zoning has diminished the value of the property. However, nothing in the record shows that the depreciation and neglect are not the result of plaintiff Georgen's own negligence and refusal to maintain the property. The trial judge even stated, "I agree that the owner [Georgen] has probably left it [the subject property] in a state of disrepair * * *."

■■ Third, the record also demonstrates the likelihood that the public welfare is promoted by the existing zoning restrictions. A Village witness with substantial experience as a real estate appraiser testified that the neighboring single-family properties could be depreciated up to 10 percent in value if the restaurant development takes place. A traffic consultant testified for the Village that single-family properties in the vicinity of the proposed restaurant site would be affected by the influx of traffic, and that the increased traffic would cause conflict both with pedestrians and homeowners' automobiles in the Wedgewood triangular area. And a planning and zoning consultant also testifying for the Village described the residential area surrounding the subject property as a good quality, well-maintained, and quiet residential neighborhood. He expressed the opinion that the proposed use would have a serious, adverse effect upon the adjoining surrounding properties and set a precedent for the east side of Rand Road. Thus, not only would the ordinance, if upheld, benefit the public by protecting it against depreciation of neighboring property values, but the ordinance under attack also shields the Wedgewood triangular area from traffic hazards that would result from the proposed restaurant.

■■ The fourth test set forth in *La Salle National Bank v. County of Cook* involves balancing the gain to the public in retaining the current zoning with the hardship which would be imposed on the property owner by denying the proposed change. Georgen bought the subject property knowing of its single-family classification, and has enjoyed rental income from both of his single-family homes. There has been no demonstrated hardship on Georgen resulting from the Village's zoning classification, except that he could not enjoy the handsome profit that would be his were the subject property rezoned. As shown below, it is feasible for Georgen to construct residences on his two vacant lots or to raze the two existing homes and construct four new homes on his property. Thus, Georgen will suffer little hardship if forced to use the subject property in accordance with the zoning ordinance in effect at the time he purchased it. Although the plaintiffs are not precluded from attacking the zoning to which the property was subject when it was purchased, they are not in as favorable

a position in determining whether the present zoning is causing Georgen hardship as would be another owner whose property was rezoned subsequent to its purchase. *American National Bank & Trust Co. v. City of Chicago* (1964), 30 Ill. 2d 251, 254, 195 N.E.2d 627; *People ex rel. Alco Deree Co. v. City of Chicago* (1954), 2 Ill. 2d 350, 359-60, 118 N.E.2d 20.

On the other hand, as set forth above, the record demonstrates that the public welfare will be promoted by preserving the present zoning restriction. A real estate appraiser called as a witness by the plaintiffs testified that no depreciating effect on surrounding areas would result from the proposed commercial use. His opinion is not persuasive, however, because he admittedly did not consider the traffic that would be coming through the Wedgewood triangular area to reach the restaurant. In the event the plaintiffs did not expect restaurant traffic to use Wedgewood Lane, there would be no point in their plan to provide a driveway from the parking lot to Wedgewood Lane. In addition, the plaintiffs' witness could not know what traffic would be generated in the future by the remaining portion of plaintiffs' property which was given a blanket B-3 zoning classification by the trial court because no one knew what specific use would be made of this portion of the subject property.

Although the plaintiffs attempted to show a need in the area for a Poppin restaurant, there are several similar restaurants already in the general area, and some were in trouble financially. Certainly the testimony of the residents living on Rand Road who favored construction of the restaurant must be considered less than compelling in light of the probable appreciation in their own property values which would result if the plaintiffs were to prevail here. Thus, a Poppin restaurant in the Wedgewood triangular area was not demonstrated by the evidence to be a clear public need.

Next, if the suitability of the property for its zoning use is even debatable, the legislative judgment is considered to be conclusive. (*Trendel*, at 164.) Here, not only is the property suitable for single-family purposes, but it is in fact presently utilized at least in part for that purpose.

The Village's appraiser and its planning consultant both testified that the highest and best use of Georgen's property was for single-family residences. The appraiser expressed the opinion that the subject property could be developed with single-family residences, complement the other residential uses in the area, and produce a profit for someone who buys the property and develops the vacant lots. He added that there was a need for such development in the area.

The planning consultant characterized the residential designation of Georgen's property in the Village's Comprehensive Plan as sound. The Village's appraiser also testified regarding new residential developments across Euclid Avenue from the Wedgewood triangular area and

established single-family residences on a heavily-traveled artery such as Elmhurst Road from Rand Road to Route 83. In fact, the trial judge commented that he was pleased to learn from the evidence in this case that single-family homeowners living on Elmhurst Road across from Randhurst Shopping Center, a large major shopping center, were spending money on their homes and he concluded that living across the road from Randhurst was not affecting their property values or injuring public safety, health or welfare. Similarly, we do not understand why residential zoning should not be suitable for Georgen's property, notwithstanding the commercial uses on the opposite side of Rand Road. The presence of less restricted uses across a highway from a single-family residential development does not make. the residential zoning unreasonable. *Lapkus Builders, Inc. v. City of Chicago* (1964), 30 Ill. 2d 304, 310, 196 N.E.2d 682.

The plaintiffs' own appraiser testified that it would be feasible to place single-family homes on Georgen's vacant lots, and despite difficulty in selling homes on a heavily-traveled road, he conceded that single-family residences on the site could be marketed. He acknowledged that the lot area was sufficient and that there was a need in the area for single-family residences. Further, the Village's traffic expert offered the opinion that accommodations could be provided so that it would not be necessary for automobiles to be exposed to the danger of backing from single-family homes on Georgen's property into Rand Road. He suggested that one way to handle such a problem would be to build a parallel service road next to Rand Road to provide access to all homes on the Georgen property. Entry to the service road would be off Wedgewood, the service road would move in a one-way direction and the exit to Rand Road would be at the northern end of Georgen's four lots. A second way would be to demolish the existing residences and build four homes with the rear of the homes facing Rand Road and a service drive with entry into each home on the east side of the homes.

Although the plaintiffs say there has been a constant change on Rand Road from single-family residences to commercial use, this argument ignores the fact that any development which has occurred has been on the side of Rand Road opposite the subject property. Aside from the nonconforming lawn mower home repair operation, there has been no change in the character of the east side of Rand Road since Georgen purchased the property. And there is no evidence that the lawn mower repair operation was inconsistent with the single-family character of the area on the east side of Rand Road.

Thus, the record establishes that the suitability of the four lots for residential use is not merely debatable, but evident. The plaintiffs purchased property zoned single-family, used a portion of it for that purpose and derived income from that use, heard their own expert

acknowledge that the property can be used for single-family homes, and are practically surrounded by single-family homes. Yet, they urge this court to conclude that the four lots are not suitable for single-family residences. We cannot accept that conclusion because, except for the small intrusions at Rand and Elmhurst and at Rand and Euclid, the Wedgewood triangular area is an oasis of single-family residences.

■■ Finally, the subject property here has been left vacant in part since it was acquired by Georgen, even though the two single-family homes have been continuously occupied and the plaintiffs' own witnesses acknowledged there has been a demand for single-family housing in the area. The record does not show any bona fide effort by Georgen to sell the vacant portion or utilize it for single-family residences, and there is no evidence of any bona fide attempt to sell the property for a reasonable price for single-family use. That the property has remained vacant does not establish that the zoning applicable to it is improper. *Western National Bank v. Village of Downers Grove* (1970), 122 Ill. App. 2d 107, 113, 257 N.E.2d 803; *Manger v. City of Chicago* (1970), 121 Ill. App. 2d 358, 369, 257 N.E.2d 473.

■■ ■ After reviewing the standards enumerated in *La Salle National Bank v. County of Cook,* we conclude that the zoning ordinance as applied to the subject property was valid, and the court should not have permitted an erosion of the single-family zoning by substituting its judgment for the village board's statutorily granted authority. The most generous appraisal of the plaintiffs' evidence as compared with that offered by the Village is that there may be a reasonable difference of opinion with respect to the standards *La Salle National Bank v. County of Cook* mandates us to apply. This is far from sufficient to overcome the presumptive validity of the zoning ordinance. *La Salle National Bank v. City of Evanston; Standard State Bank v. Village of Oak Lawn* (1963), 29 Ill. 2d 465, 194 N.E.2d 201.

Where a plaintiff seeks by court action to overturn a zoning ordinance, his burden in overcoming the presumption that the ordinance is valid is appropriately a heavy one. In considering a rezoning application a decision-making body is forced to try to predict what changes will occur in the future. Much of the evidence in a case such as this, then, relates not to what is happening currently or to events of the past, but rather to what effects a development not yet in existence will have upon areas which may at the same time be affected by other factors. Attempting to predict such effects is a most uncertain undertaking; and this is why any plaintiff seeking to change the *status quo* is expected to present a strong, clear and convincing case for replacing the known present with his ideas for a better future. (See *Stemwedel v. Village of Kenilworth* (1958), 14 Ill. 2d

470, 153 N.E.2d 79.) The plaintiffs failed to make such a case here. On the record before us, the legislative judgment of the village board of trustees should not have been disturbed.

Because of our conclusion that the judgment of the trial court must be reversed on the ground discussed above, it is unnecessary to consider the Village's additional arguments (i) that the plaintiffs failed to exhaust their local and administrative remedies, and (ii) that the circuit court exceeded its authority in granting the plaintiffs the right to make any use of the remaining portion of their property permitted by the Village's business zoning classification even though the plaintiffs failed to propose a specific use for that portion.

Judgment reversed.

McNAMARA and McGILLICUDDY, JJ., concur.