HAZEL WARD *et al.*, Plaintiffs-Appellants, *v.* THE COUNTY OF COOK, Defendant-Appellee.

First District (1st Division)   No. 77-1567

Opinion filed January 8, 1979.

Robert Marks, of Chicago (Marks, Marks and Kaplan, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Stuart Gordon, and Nancy Krajec, Assistant State's Attorneys, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

This zoning litigation, instituted by Hazel Ward and Forest Hills Development Company (plaintiffs), against County of Cook (defendant) resulted in a judgment for defendant. Plaintiffs have appealed.

The vacant subject property is located in Lyons Township, an unincorporated area of Cook County. The property is a regular rectangle. Its eastern and western boundaries are each 258.90 feet. Both its northern and southern boundaries are 942.21 feet. The tract contains approximately 5½ acres. The eastern boundary fronts upon Willow Springs Road. The remaining boundaries of the tract abut upon other properties.

Proceeding to the west of the subject tract, we find Howard Avenue, then Franklin Avenue and Wolf Road in order. To the east of the property, across and east of Willow Springs Road, we find Edgewood Avenue, a number of shorter streets and then Brainard Road. To the south of the property the streets are numbered 60th Street, 62nd Street and 63rd Street. To the north of the property, 59th Street is not a through street and the next street is 59th Place. Plainfield Road, running north and west of the subject property, is a diagonal from southwest to northeast.

At the present the property is zoned R-4 by defendant's ordinance. This category permits single-family residences on lots of at least 20,000 square feet, which is one-half an acre. The property has been zoned under these requirements since 1968. When this zoning originated, water and sewer connections were not available to the property. At present such facilities are available.

The zoning of the surrounding area is best discerned by a view of the

map. The property is abutted and surrounded on all sides by R-4 zoning. There is a small area of five lots developed under R-5 zoning, which permits single-family homes on a lot not less than 10,000 square feet in area. The parcel is located approximately 450 feet south of the southeast corner of the subject property. It is an irregularly shaped tract of about four lots fronting upon Willow Springs Road for about 600 feet. About 700 feet to the southwest of the subject property is a golf course also zoned R-5. There are a church, school and fire station under P-1 zoning fronting upon and across Plainfield Road, about 200 feet from the subject property. The map also shows some areas of R-1 zoning which are within the City of Countryside and the Village of Indian Head Park.[1] The entire balance of the surrounding zoning is predominantly R-4. The areas within a radius of one-quarter of a mile from the subject property are developed with single family homes on half-acre lots. A land use and planning expert called by plaintiffs described this as the established land use trend in the area of the subject property.

The subject property is owned by plaintiff Hazel Ward who acquired it by inheritance. On January 2, 1974, she entered into a written agreement giving plaintiff Forest Hills Development Company an option to purchase for $120,000; subject to accomplishment of rezoning. This price was $20,000 less than the initial purchase price suggested by the owner when she first listed the property for sale. About that time a sign indicating that the property was for sale was posted thereon. There is no evidence that Mrs. Ward or the previous owner took any other action to sell or develop the property for the 5 years prior to the option.

When the option was executed the parties thereto were aware of the zoning ordinance. There is evidence that the configuration of the property would restrict the improvement thereon to eight homes. Theoretically there is room for 11 homes under R-4 zoning. Any residential development would require an access street through the property. The Zoning Board of Appeals and the Board of Commissioners of defendant denied an application by plaintiffs for rezoning of the tract to R-5.

Plaintiffs offered expert testimony and a site plan reflecting the use to which they would put the property. There would be an access street within the development running west from the Willow Springs Road entrance, close to the southern Boundary. This road would curve up to about the center of the tract and continue west. A turnabout would be constructed close to the western boundary.

The site plan reflects 26 single-family residence units, varying from two stories, single stories and trilevels. Buyers of homes would have a choice of three building types all consistent with homes already erected in

---

[1] These municipalities, with leave of court, intervened in the circuit court proceedings. They have not participated in this appeal.

the area. Each home would have a one-car garage and each would be provided with a driveway some 30 to 40 feet in length. No two homes would be closer than 14 feet. No building would be closer than 10 feet from the lot line.

There would be an open area in the eastern portion of the property which would enable construction of eight single-family homes in a cluster. This would permit an open park area of approximately one acre in the center of the tract and other open spaces as required for proper drainage of storm waters.

The theories of the parties were brought out by the testimony of qualified experts. Plaintiffs called the builder and prospective developer of the tract; an architect and planner; a student of land use and planning; an engineer and two real estate appraisers. Defendant called a planning and zoning expert and a real estate and appraisal expert. We will not summarize the testimony of each of these witnesses separately. We will state a summary of their testimony concerning the various factors here involved.

The architect and land planner called by plaintiffs defined the term "highest and best use" of land as meaning the development of real estate to produce the highest economic return consistent with social and economic standards and without depreciation of surrounding properties. He expressed the opinion that lot areas of 20,000 square feet were no longer necessary since availability of water and sewer connections at the subject site had eliminated the need for individual wells and septic fields to serve each home. He testified that, in his opinion, the proposed planned development of the property as suggested by plaintiffs, with single-family residential use under R-5 zoning, would be the highest and best use of the tract. This opinion was supported by testimony from two real estate appraisers. The real estate expert and the planning and zoning expert called by defendant both expressed the opinion that the highest and best use of the property was single-family residential development under the present R-4 zoning.

Both sides offered proof regarding the effect of the proposed planned development upon the surrounding area. One of the real estate experts called by plaintiffs testified that the current trend and demand in building was for smaller sites. In his opinion, the proposed use was compatible and consistent with existing zoning and uses in the area. He felt the difference in density between that permitted by the present zoning and the proposed development would not alter compatibility as this type of varying density was not unusual. He testified the effect on property values in the neighborhood would not be different in either situation.

One of the expert planners called by plaintiffs testified virtually to the same effect. He expressed the opinion that the proposed development

would not adversely affect public health, safety and welfare in the community and the proposed use would be no different in its effect than development under the present zoning. In his opinion, the proposed use was consistent and compatible with the uses in the area of the subject property.

Another expert appraiser called by plaintiffs testified to the same effect concerning the present demand for homes of lower cost. He expressed the opinion that, because the proposed use was a single-family residential improvement, it would have no deleterious effect on surrounding property uses or values. He explained that the area in question had already been substantially developed. He testified that the proposed use would have no adverse effect on public health, safety or welfare but that development under present zoning would increase traffic in the area.

On the contrary, the planning and zoning expert called by defendant expressed the opinion that the proposed planned development would impair the ability of adjoining residents to use and enjoy their property. In this concept, he included aesthetic enjoyment of the surrounding area and of the scenic view. He testified that traffic would be increased under the proposed use. He based this opinion concerning traffic upon the proposition that more houses meant more automobiles. In his opinion, the trend of development in the immediate area of the subject property was for single-family homes on one-half acre lots.

The real estate expert called by defendant was familiar with sales of vacant lots in the area of the property. Based upon his knowledge and experience in real estate values, he stated that the proposed use of the subject property would cause an approximate depreciation of $10,000 each as to existing family homes immediately to the north. In his opinion, two homes on Howard Avenue, immediately to the west of the property, would also be adversely affected in value to the extent of approximately $10,000 each. Homes to the south of the subject property would be adversely affected in value by about $5000 each.

The parties stipulated that if some 20 residents of the surrounding area were called, they would testify in accordance with their affidavits which were offered in evidence by defendant. Photographs of homes owned by these affiants were also offered. The affidavits stated in substance that the homes were purchased in reliance on existing zoning and that the proposed use of the subject property would adversely affect their present value.

On the issue of traffic, the expert on land use and planning called by plaintiffs testified that traffic studies were made under his direction and supervision. These studies pertained to the traffic volume on Willow Springs Road during peak hours. In his opinion, these studies showed a

relatively modest amount of traffic on the road during those hours. He expressed the opinion, based on the study, that the proposed use of the property would have essentially no significant effect upon traffic in the immediate area.

Plaintiffs also called an expert consulting civil engineer. He had designed proposed sewer and water systems for the planned development. His study of the property and his consultations with various governmental bodies showed that the property would have ample water supply from an existing 12-inch water main on Willow Springs Road. This would provide adequate service for domestic and fire fighting uses. In addition, he found existing sewer facilities available to meet the needs of the proposed planned development. This arrangement could be made through an existing 10-inch sanitary sewer line on the west side of Willow Springs Road.

The expert also studied the question of draining off storm water. The high points of the property run diagonally across the land. The engineer described in detail a storm sewer system which, together with detention basins, would operate to provide adequate drainage for the homes in the proposed use. He estimated that the total cost of sanitary sewer and water facilities, storm water elimination, street paving and other necessities would be $134,158. In his opinion, if the property were to be developed for the building of eight homes under present zoning, the cost of these necessary installations would be reduced, but only by $5500. In either event, improvements of this nature were essential for development of the property.

Regarding the fair market value of the property, one of the appraisers tendered by plaintiffs expressed the opinion that its value as presently zoned and without improvements was $55,000. If classified R-5, the property would be worth $110,000. Another of plaintiffs' experts stated the present value as from $60,000 to $70,000. Under R-5 zoning, its value would be $120,000. The expert called by defendant appraised the property at $120,000 as presently zoned. In his opinion, if rezoned R-5, its value would be $141,000.

■■ We have not stated in complete detail the facts and arguments depended upon by the various experts in formulating their opinions. We deem this unnecessary as the undisputed physical and other facts form a large part of the basis for the various expert opinions. In addition, the trial judge as the trier of fact was not obliged to accept the opinion of any expert regarding the ultimate issues in the case. *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 122, 273 N.E.2d 809; *Baikie v. Luther High School South* (1977), 51 Ill. App. 3d 405, 411, 366 N.E.2d 542.

■■ Application of legal precedents to zoning questions is difficult. Each

case is virtually *sui generis.* We are therefore obliged to reason from basic principles to the facts before us. It is possible to cite many cases which establish these legal guidelines. However, we need refer only to *Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 354 N.E.2d 899, and *Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 324 N.E.2d 406. These cases and the authorities therein cited furnish the following guidance:

(1) Zoning ordinances are presumed valid.

(2) A plaintiff who attacks a zoning ordinance bears the burden of establishing "by clear and convincing evidence that the ordinance, as applied, is arbitrary and unreasonable and bears no substantial relation to the public health, safety or welfare." *Tomasek,* 64 Ill. 2d 172, 180.

(3) An ordinance will be upheld if the proof shows that it bears "any substantial relationship to the public health, safety, comfort or welfare." *Tomasek,* 64 Ill. 2d 172, 179.

(4) Where it appears that there is room for a fair "difference of opinion concerning the reasonableness of a classification, the legislative judgment must be conclusive." *Tomasek,* 64 Ill. 2d 172, 180, quoting from *La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 428, 312 N.E.2d 625. See also *Duggan,* 60 Ill. 2d 107, 110.

In approaching the problem of validity of a zoning ordinance in any specific situation, it is best to consider the six important factors codified by the supreme court in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46, 47, 145 N.E.2d 65. We will attempt to apply each of these factors to the evidence before us in the case at bar.

### I.

We will first consider the existing uses and zoning of nearby property. As above shown, the subject property is abutted on three sides by similar zoning, the R-4 classification. The eastern boundary is Willow Springs Road and the R-4 zone continues from the eastern edge of Willow Springs Road far to the east for a number of blocks. Similarly, the R-4 zoning continues solidly to the north, west and south of the subject property, broken only by the public school, the golf course and the very small enclave of R-5 zoning above described.

The existing uses in the area of the subject property conform to the R-4 zoning almost without exception. The entire surrounding area is well developed with single-family homes upon lots of 20,000 square feet, being half an acre. Expert opinion was unanimous that this use is the established trend in the area of the subject property.

This is a strong factor in support of the decision reached by the trial court. The use proposed by plaintiffs under the R-5 classification would constitute an unwarranted intrusion into an established and stable area of R-4 zoning and actual R-4 use. In our opinion, this would constitute spot

zoning which would be an unharmonious influence upon the stability of the surrounding area. See *Duryea v. City of Rolling Meadows* (1970), 119 Ill. App. 2d 445, 454, 455, 256 N.E.2d 32, citing *Reskin v. City of Northlake* (1965), 55 Ill. App. 2d 184, 189, 204 N.E.2d 600, *appeal denied* (1965), 31 Ill. 2d 631.

This point regarding existing uses and zoning of nearby property and whether those uses are uniform and established has been described as being of "paramount importance" in the decision of zoning cases. (*Standard State Bank v. Village of Oak Lawn* (1963), 29 Ill. 2d 465, 469, 194 N.E.2d 201; *Treadway v. City of Rockford* (1963), 28 Ill. 2d 370, 192 N.E.2d 351; *Sutter v. Village of Mundelein* (1963), 27 Ill. 2d 589, 592, 593, 190 N.E.2d 321.) On this issue there is no conflict in the evidence and even a cursory examination of the zoning and use maps and the opinions of the experts is sufficient to demonstrate that the zoning and uses surrounding the subject property are uniform and established as residential under the R-4 category.

## II.

The next factor is the extent to which value of the subject property is diminished by the zoning ordinance. The real estate experts were unanimous in their opinion that the subject property would be worth more if the use proposed by plaintiffs was established. However, as above shown, the witnesses differ in the amount of the variation. The experts called by plaintiffs were of the opinion that invalidation of the zoning ordinance would virtually double the value of the subject property. Defendant's expert stated the difference was $120,000 as presently zoned and $141,000 if rezoned R-5.

The existence of a value diminution does not necessarily require invalidation of the zoning ordinance. Given an increase in density of use from 8 homes to 26 units, we would necessarily anticipate some increase in the total value of the tract. However, this same situation exists in virtually every zoning case in which the opponent of the ordinance seeks permission for a greater density of use. See *Treadway*, 28 Ill. 2d 370, 378; *Liberty National Bank v. City of Chicago* (1956), 10 Ill. 2d 137, 143, 139 N.E.2d 235; *Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 238, 311 N.E.2d 268, *cert. denied* (1975), 420 U.S. 929, 43 L. Ed. 2d 401, 95 S. Ct. 1130.

## III. and IV.

The third factor listed in *La Salle National Bank* (12 Ill. 2d 40, 47), as to whether the reduction of value of the subject property promotes the health or general welfare of the public, is closely related to the fourth factor concerning the relative gain to the public as compared to the

hardship imposed upon the plaintiffs. We will consider these points together.

There is a conflict in the evidence as to the effect of the proposed development upon property values in the surrounding area. As shown, two real estate experts called by plaintiffs expressed the opinion that the proposed use was compatible with existing zoning and that it would have no deleterious effect on surrounding property uses or values. On the other hand, the planning expert and the real estate expert called by defendant both testified that there would be a deleterious economic effect upon the surrounding area resulting from the proposed use.

The planning expert called by defendant stressed the aesthetic enjoyment of the area by people living there at the present time. In our opinion, it is not likely that the intrusion of an area of substantially greater density would have no aesthetic effect on the surrounding homes predominantly built upon half-acre lots. It is true that plaintiffs offered expert opinion, based upon a traffic study, that the density would have no significant effect upon vehicular traffic. However, it is unreasonable to believe that the increased density would not necessarily bring some traffic increase, even of slight proportions.

■ It is accepted at the present time that the aesthetic enjoyment of one's home is closely related to the legal problems of zoning. In our opinion, the affidavits made by the owners of surrounding homes are of little or no value in determining the economic effect of the proposed use. (See *Oak Forest Mobile Home Park v. City of Oak Forest* (1975), 27 Ill. App. 3d 303, 316, 326 N.E.2d 473, and authorities there cited.) However, the opposition of these people for aesthetic reasons should not be disregarded.

■ It has been repeatedly held by the courts of Illinois that aesthetic factors do have a significant bearing upon zoning to such an extent that they "may, in some instances, be utilized as the sole basis to validate a zoning classification * * *." (*La Salle National Bank v. City of Evanston*, 57 Ill. 2d 415, 432. See also *Grobman v. City of Des Plaines* (1975), 59 Ill. 2d 588, 595, 322 N.E.2d 443; *Continental Homes v. County of Lake* (1976), 37 Ill. App. 3d 727, 734, 346 N.E.2d 226, and *Singer v. City of Highland Park* (1975), 31 Ill. App. 3d 1071, 1075, 335 N.E.2d 585.) *Singer* and *La Salle National Bank* both cite *Village of Belle Terre v. Boraas* (1974), 416 U.S. 1, 9, 39 L. Ed. 2d 797, 804, 94 S. Ct. 1536, 1541, where the Supreme Court expressly commented upon use of the police power for the legitimate purpose of making an area "a sanctuary for people."

In the case before us there is testimony by the planning and zoning expert called by defendant that, in his opinion, the proposed planned development would do harm to the ability of residents in the surrounding area to obtain enjoyment from the use of their homes. This impairment of

scenic views and of the resulting ability to enjoy residential property would, in the opinion of the expert, be extended to nearly all of the area on the west side of Willow Springs Road surrounding the subject property with particular reference to a reduction in the total amount of open space in the vicinity of these homes. In our opinion, it cannot be denied that, although not decisive, aesthetic reasons as thus expressed tend to support the judgment reached by the trial court.

The real estate expert called by defendant estimated the depreciation of values regarding existing family homes to the north and west of the proposed use as being $10,000 each and the decrease in value of homes to the south by $5000 each. This witness was familiar with sales of vacant lots in the immediate area. In view of the conceded difference in density between the proposed use and the surrounding homes, it would seem difficult to accept an opinion regarding complete lack of possible depreciation from the proposed development.

The companion issue is whether the reduction of value of the site upon which plaintiffs hold an option would promote the health, safety, morals or general welfare of the public. We conclude that there would be a gain to the surrounding homeowners from rejection of the proposed use. This gain lies in protection of the surrounding area against depreciation or economic loss and also in a protection of the right to aesthetic enjoyment of their property.

As regards the issue of hardship upon the plaintiffs, this is necessarily limited to the economic loss which the holder of the option would sustain as above discussed. In this regard it must be considered that the holder of the option has not actually purchased the subject property. Consequently, denial of the proposed use would cause the developer an out-of-pocket loss of the cost of obtaining the option. The developer, holder of the option, was fully aware of the present zoning of the property and entered into the option agreement with knowledge of the importance of the zoning. It has been held that although "this fact does not preclude challenging the restriction, the fact must necessarily be considered in the proceedings." *Standard State Bank v. Village of Oak Lawn*, 29 Ill. 2d 465, 470.

In *Grobman*, 59 Ill. 2d 588, 596, the supreme court pointed out that when a person attempts to challenge a zoning ordinance, "the fact that he purchased the property in the face of the restriction is a relevant circumstance, and he is in a different position than an owner who purchased prior to the restriction on the property." See also *Treadway*, 28 Ill. 2d 370, 378.

Quite to the contrary, each and all of the owners of single-family homes in the surrounding area purchased or erected these homes under R-4 zoning on lots with an area of one-half acre. This court has held that the

right of every property owner to rely upon the zoning classification in effect when his property was purchased is "one factor of crucial importance * * *." *Oak Park National Bank v. City of Chicago* (1973), 10 Ill. App. 3d 258, 271, 294 N.E.2d 42.

## V.

The next issue is suitability of the subject property for the zoned purposes. Plaintiffs urge that the area in question was originally developed upon lots of half-acre size only because sewer and water facilities were not available so that lots of this size were required for individual wells and septic systems. This argument is effectively countered by the fact that the parcel to the north of the subject property, comparable thereto in size and shape, was developed under the same zoning on lots of the same size after sewer and water facilities were made available.

Although plaintiffs called a qualified engineer who fixed the cost of improving the subject property for building purposes at approximately $130,000, the real estate appraiser called by defendant testified that the necessary improvements could be installed at a lesser cost approximating $80,000. In his opinion, the value of homes in the immediate area would range from $50,000 to $125,000. The president of the developer testified that the price range of a complete family home upon the subject property would be over $110,000. In addition, the two expert real estate appraisers called by plaintiffs testified that the increased cost of land, improvements, utilities and construction would drive the selling price of single-family homes upon this site, if erected under R-4 zoning, far above the market price. However, it is common knowledge that inflationary trends have had at least an equal effect upon the selling prices of completed homes as they have had upon the cost of utilities and improvements.

The land planner and zoning expert called by defendant inspected the area and gave the opinion that it would be economically feasible to develop the subject property under the existing zoning. In our opinion, this situation presents a conflict of evidence or a difference of opinion which it was the duty of the trial court to resolve. (*La Salle National Bank*, 57 Ill. 2d 415, 428.) Considering all of the evidence bearing upon this subject, we are unable to conclude that the finding by the trial court, that it is not economically unfeasible to develop the subject property as zoned, is contrary to the manifest weight of the evidence.

## VI.

The final test is a determination of "the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property." (*La Salle National*

*Bank,* 12 Ill. 2d 40, 47.) The record before us shows that Hazel Ward inherited the property sometime prior to 1974. She listed the property with a real estate firm which erected a sign evidencing that it was for sale. The asking price for the property was $140,000. The real estate experts called by plaintiffs valued the property as presently zoned from $50,000 to $70,000. The option price for the property, conditioned upon rezoning, was $120,000. The evidence does not disclose any other attempt to sell or develop the property.

Upon the basis of this record, we cannot conclude that the zoning is at fault in connection with the vacant condition of the subject property. "That the property has remained vacant does not establish that the zoning applicable to it is improper." (*Georgen v. Village of Mount Prospect* (1978), 65 Ill. App. 3d 512, 382 N.E.2d 523, and cases there cited.) It would not appear that the size, shape or configuration of the subject property has prevented it from being developed under existing zoning because of the development of the similar site immediately to the north under the same zoning.

In short, upon examination of the entire record, we find that plaintiffs have failed to establish by clear and convincing evidence that the ordinance is arbitrary and unreasonable and bears no substantial relation to the public health, safety or welfare in its application to the subject property. The very best that may be said for the case made by plaintiffs is that there is a legitimate difference of opinion concerning the reasonableness of the legislative classification. We may not disturb the findings reached by the trial court because we cannot find that they are contrary to the manifest weight of the evidence. (*Tomasek,* 64 Ill. 2d 172, 181.) In our opinion, the trial judge evinced a complete and admirable grasp of the factual and legal issues here involved. His findings are well supported by the evidence. The judgment is accordingly affirmed.

Judgment affirmed.

McGLOON and O'CONNOR, JJ., concur.