CHICAGO TITLE AND TRUST COMPANY, Trustee, *et al.*, Plaintiffs-Appellees, *v.* THE VILLAGE OF SKOKIE, Defendant-Appellant.—(ARNOLD PACKER *et al.*, Intervenors-Appellants.)

First District (5th Division)    No. 76-1675

Opinion filed May 5, 1978.

Harvey Schwartz, Corporation Counsel, of Skokie, for appellant Village of Skokie.

Melvin A. Weinstein, of Chicago, for appellants Arnold Packer *et al.*

Theodore J. Novak and James R. Mikes, both of Chicago (Rudnick & Wolfe, of counsel), for appellees.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiffs, Chicago Title and Trust Company, as trustee, and Marie Gatschet, Annaliese Moldenhauer and Eric Moldenhauer, as beneficial owners, filed a complaint for declaratory judgment against defendant, village of Skokie, asking that the village of Skokie Zoning Ordinance be

declared invalid as applied to certain real property. Arnold and Marilyn Packer, owners of a single-family residence on a street adjoining the subject property, and 15 other such owners were granted leave to intervene. After a trial without a jury, the trial court on October 29, 1976, entered judgment for plaintiffs, from which defendant and intervenors appeal. The issue on appeal is whether the trial court erred in finding that the provisions of the Skokie Zoning Ordinance, as applied to the subject property, are unreasonable and void.

We affirm.

The subject property is an irregularly shaped parcel of land with an area of approximately 1.5 acres. It is located approximately 158 feet north of the center of Golf Road, on the west side of Laramie Avenue, if extended in the village of Skokie. It is presently improved with a two-story, single-family residence, occupied by plaintiffs Gatschet and Moldenhauer, and a one-story garage used for plaintiffs' upholstery business.

Plaintiffs entered into a contract with Edward Schwartz, a real estate developer, giving him the right to acquire the subject property, contingent upon plaintiffs' prevailing in a request to rezone the property from R-1, a single-family residential district under the Skokie Zoning Ordinance, to R-4, a general residential district allowing multiple-family dwellings. The contract price is graduated according to the number of units for which plaintiffs are able to obtain zoning approval, the price ranging from $155,000 to $240,000, depending upon the density allowed.

The north boundary of the subject property measures approximately 221 feet and is bordered on the north and northeast by Niles Township North High School and its athletic fields. The high school campus is zoned R-1, as is the subject property. The east boundary of the subject property measures approximately 376.65 feet and would form the west line of Laramie Avenue, if extended. The east boundary also abuts the cul-de-sac at the west end of Weber Lane, an improved street with lots zoned R-1 along the north and south lines of Weber Lane. The lots are developed with single-family residences owned by the intervenors. The two westernmost lots have west side yards adjacent to the subject property. The north line of the lots on the north side of Weber Lane coincides with the south line of the high school campus. The south line of the subject property measures approximately 127 feet and borders the area lying north of Golf Road which is zoned M-2 for light industry. The latter area forms the northwest corner of Laramie Avenue and Golf Road and is occupied by a Northern Illinois Gas Company regulator station. The western boundary of the subject property abuts the Chicago and Northwestern Railroad freight line and Commonwealth Edison high tension wire rights-of-way, which are also zoned M-2. The western

border of the subject property extends in a northwesterly direction, giving the site a trapezoidal shape.

Opposite the subject property's southeast corner and extending along the north side of Golf Road and east of Laramie Avenue are an office building, carpet sales store, parking and a number of single-family homes. These properties are adjacent to the R-1 residences lining the south side of Weber Lane. The part of the block containing the offices, store and parking is zoned B-2, commercial, and R-1, with a special use permit for the business. The homes are in an R-2 single-family residential district.

Located on the south side of Golf Road, east of Laramie, are a gas station and an office building in a business zone with a special use permit, and vacant parcels of land and some single-family homes in an R-2 district. The southwest corner of Laramie Avenue and Golf Road is zoned M-2 and is the approach to the railroad crossing. Immediately to the west of the railroad on the south side of Golf Road is a B-2 district with a veterinary clinic, a hot dog establishment and some undeveloped property. Extending north from Golf Road along the west side of the railroad is an automobile dealership, in a continuation of the M-2 zone of the railroad and utility rights-of-way.

The Edens Expressway traverses the area in a northeasterly direction west of the railroad and can be seen from the subject property. Approximately two blocks east of the subject property, on the north side of Golf Road, is the Old Orchard Shopping Center in a B-4 regional shopping zone. Opposite Old Orchard along the south side of Golf Road are several single-family homes in an R-2 zone and a condominium development under a special use permit in a B-2 zone. The condominiums are approximately one-quarter mile from the subject property.

Plaintiffs and Schwartz propose to use the subject property either for a 24-townhouse development or a 48-unit condominium development. Under both plans the buildings would be of a contemporary style with landscaping areas and children's play lots between the building units. Access to the site under either plan would be via Laramie Avenue from Golf Road, with Laramie Avenue to be paved to a width of 36 feet to allow parking on both sides of the street. There would be no vehicular access from Weber Lane, an improved street with single-family residences, which intersects the subject property's east boundary at the projected extension of Laramie Avenue.

The townhouse development would be of a two-story attached type. Each unit would have three bedrooms. The 24 units would be arranged in clusters of three and four scattered throughout the site. Each unit would have approximately 650 square feet of living space on the ground floor and 700 square feet of living space on the second floor. The total land

coverage of the buildings on the site would be approximately 15,600 square feet or about 25% of the total land area. There would be parking for 49 cars on site, 33 under carports and the balance in open spaces. The building height would be approximately 20 feet.

The alternative plan would provide for a total of 48 condominium apartments in two four-story buildings, one with 28 units and one with 20 units. The 28-unit building would consist of 21 two-bedroom units and 7 one-bedroom units. The buildings would be 37 feet high and cover 28% of the subject property. A total of 95 on-site parking spaces would be provided, 29 inside and 66 outside. The outside parking would be located on the west side of the site, away from Weber Lane.

At the trial expert witnesses were called to testify on behalf of both plaintiffs and defendants. The individual plaintiffs did not testify. One intervenor testified on behalf of all of the Weber Lane homeowners. The following is a summary of the testimony of the various witnesses.

Edward Schwartz, a real estate developer and the contract purchaser of the subject property, testified on behalf of plaintiffs. Schwartz related that there had been two appearances before the Skokie Planning Board for reviews of proposed developments of the subject property. The first appearance pertained to an earlier proposal, which was rejected. The second appearance was for the review of the currently proposed developments. Attempts were made to meet with the Weber Lane homeowners before each Board appearance and approximately six families appeared the first time, none the second. Schwartz also testified that financing would be available if the subject property were rezoned and that the cost of developing the subject property under the present R-1 zoning was unfeasible. On cross-examination Schwartz stated that development of the subject property as it is now zoned would result in dividing the site into six 55-foot lots at a cost of $38,000 per lot. This price includes improvements but does not take into consideration any financing factors. No financing factors were considered because Schwartz felt the projected cost at that stage to be too high to proceed any further. Schwartz estimated that the cost of a home on one of the six lots would be $145,000 to $150,000 and, in his opinion, no one would be willing to pay that price for a home that backs up to railroad tracks.

Plaintiffs next called Jerome Soltan, a licensed architect, who had drawn the plans for the proposed developments. Soltan testified that he was familiar with the Skokie Zoning Ordinance and building codes and that the coverage of the site by the buildings under either plan would be slightly less than 28%, which is significantly lower than the 40% maximum coverage allowed in zones R-1 through R-3.5 and the 45% coverage allowed in R-4. If carports are also considered, the coverage would be no more than 33%. Soltan stated that numerous meetings were held with the

Skokie Fire Department and the Skokie Public Works Department to discuss the proposed developments. The two departments made recommendations regarding water mains, storm drainage, fire hydrants and access for emergency vehicles. Several meetings with the Skokie Planning Department were also held. The suggestions of the Village agencies were incorporated into the plan. Soltan testified that the view of the Weber Lane residents was also taken into consideration in planning the development. The buildings would lie between Weber Lane and the railroad tracks, with parking behind the buildings. The buildings would thus totally screen the parking area from Weber Lane. In addition, Soltan noted that any outside refuse areas would be at the western-most boundary of the subject property, also not visible from Weber Lane. To prevent a total wall of buildings, however, there would be landscaped spaces between the buildings. On cross-examination Schwartz testified that, although from an architectural standpoint single-family homes could be developed on the subject property, it was his opinion that considering the railroad and the high tension wires at the rear of the site, it would be very difficult to sell a home on the property at the price that would be necessitated by the costs of land improvements and construction.

Paul C. Box, a traffic engineering consultant, testified for plaintiffs. Box had conducted a traffic-feasibility study for the proposed development, taking traffic counts at the intersection of Laramie Avenue and Golf Road. In his opinion neither the townhouse development nor the apartment-building development would generate sufficient traffic to become a significant added traffic hazard, nor would there be any significant added traffic congestion from either development. In the opinion of Box the present thoroughfares are entirely adequate to accommodate the traffic generated by the proposed developments. On cross-examination Box testified that either of the proposed developments would require that Laramie Avenue be paved at a width of 36 feet, instead of its present width of 23 feet, to allow parking on both sides of the street. He also testified that a single-family development on the subject property would require that Laramie Avenue be widened to 30·feet. He stated that the volume of traffic on Golf Road, a major traffic route, now has an impact on the residential traffic on Weber Lane, because there are two ways into Weber Lane. If Laramie Avenue were opened and improved as a street, it would become a local dead-end street.

Richard Stern, an urban planner, testified on behalf of plaintiffs on matters of land planning and use. Stern described the land uses and zoning in the surrounding area and stated that each of those uses helps to characterize the subject property. Stern defined the highest and best use from a community planning standpoint as that use which can be incorporated into the scheme of community development without

adversely affecting abutting properties or owners and still affording a fair economic return to the owner of the property. In his opinion the highest and best use of the subject property is not for single-family homes. He stated that both proposals of plaintiffs come within his definition of the highest and best use and that either proposal would serve as a transitional use between the more intensive use of land to the west of the site and the less intensive single-family use to the east. Stern testified that in most cases property derives the majority of its character from land on which it fronts rather than land it abuts on the side or rear. As applied to the subject property, he believed that the two Weber Lane homes whose side yards abut the subject property would lend character to the site. He also added that Weber Lane would not be affected, or only marginally so, by the development of the subject property for any use and that the only negative effects accruing to those properties would be from construction traffic.

Stern distinguished the development of the subject property for single-family homes from the development south of Golf Road of single-family homes along Terminal Avenue, a street running along the west side of the railroad right-of-way with single-family homes backing up to the railroad tracks. Stern believes that Terminal Avenue is more appropriate for single-family development because the lots are regularly shaped, are 85 to 90 feet deep and are readily accessible due to the number of ingress and egress points. The subject property, on the other hand, would have irregularly shaped lots due to the trapezoidal shape of the parcel, and is accessible only through Weber Lane and Laramie Avenue. In addition, the subject property has a direct view of the Edens Expressway and other commercial developments, which is not the case for the homes on Terminal Avenue.

On cross-examination Stern stated that an 18-unit development on the subject property might come within his definition of the highest and best use for the site, but that a 12-unit development would not because it would not afford a fair economic return to the owner. In determining the highest and best use, Stern considered numerous factors including the location, size and shape of the subject property, its topography, soil and other natural features, surrounding land uses and zoning, patterns of land use including recent developments in the area, the need for marketability, traffic ramifications and the economic return to the owners. He did not make an independent market survey concerning the need for multiple-family residences in Skokie. Regarding the character of the land, Stern stated that property does not always take its character from the property immediately adjacent to it. In the case of the subject property the degree of impact varies. The homes on Weber Lane, two of which abut the subject property, and Niles Township North High School have a marginal

effect on the site's character, while other area uses have a greater effect, based on the activities that occur. The surrounding land uses which may have a greater impact on the character of the subject property do not have to be visible from the site, particularly if they can be heard or if they generate traffic or have some other means of impact. Examples of these, Stern said, are the Edens Expressway, which can be seen and heard from the subject property, the gas regulator station which generates noise, and the condominium complex with its intense multiple-family development.

Stern defined spot zoning as zoning that is completely out of context with surrounding land uses and surrounding zoning, if that zoning is in fact developed. In his opinion reclassification of the subject property for the proposed development would not constitute spot zoning. Under the current zoning, Stern said, only six homes could be built on the site and he does not believe they could be served properly off Laramie Avenue. He indicated that to develop the subject property with eight single-family homes as proposed by the village would require zoning variations.

In discussing the various zoning classifications in the area, Stern pointed out that the only areas in the entire village which are zoned R-1 and abut the railroad are the subject property and the high school. He calculated the amount of R-1 land abutting the railroad to be 2.2% of all land along the railroad, with 11.3% being zoned R-4, 45.3% zoned for manufacturing use and 13.7% for office research. He also indicated that within a radius of 600 feet from the cul-de-sac on Weber Lane, there are five separate zoning classifications and several special uses, the zones being R-1, R-2, B-2, O-R and M-2.

Frank Roy Angelotti, a consulting civil engineer called as a witness by plaintiffs, testified that the existing sanitary sewer, storm sewer, and water mains, to which the proposed development would be connected, are of adequate capacity to serve such a development. He stated that the two plans proposed by plaintiffs incorporate suggestions made during meetings with the Village staff. In Angelotti's opinion, from an engineering and utilities standpoint, there would be no adverse effect on the adjoining property owners.

William A. McCann, a real estate appraiser and consultant, testified for plaintiffs. He stated that the character of the area is mixed commercial and residential along Golf Road with a fair degree of utilities in the area such as Northern Illinois Gas, the railroad and Commonwealth Edison. He generally described the area. Both of plaintiffs' proposals fall within his opinion of the highest and best use of the subject property, with the 48-unit condominium plan representing the highest and best use and the townhouse plan within the range of acceptable uses of the site. In his opinion the fair cash market value of the subject property under its present R-1 classification is $60,000. Under the 48-unit condominium plan

the value of the subject property would be $300,000 and if developed under the 24-townhouse plan, the value would be $200,000. McCann stated that the multiple-family use of the subject property would have no depreciatory effects on surrounding property types or trends. He also stated that R-1 single-family use would not represent the highest and best use of the subject property, nor is the site suitable for single-family development under the R-1 classification. In his opinion an R-2 use of the subject property would be compatible with the homes on Weber Lane.

On cross-examination McCann stated that under the R-1 classification it may be possible to derive six single-family sites. The raw value of those sites would not exceed $10,000 prior to street and utility extension. The probable sales price of a single-family home constructed on the site would be $60,000 to $70,000, due to the presence of the railroad tracks, high tension lines and other undesirable uses along the western boundary of the subject property. According to McCann the market would indicate that within that sales price range, a developer could not afford to have more than 20% of the total retail sales price in the land.

McCann stated that most of the homes on Weber Lane are worth between $90,000 and $99,000. A recent sale of the second house east of Laramie on the south side of Weber Lane was for $90,000. In 1973 a house in the middle of the block on the north side of Weber Lane sold for $61,500. The multi-family development proposed by plaintiffs would have no adverse or depreciatory impact on the homes on Weber Lane and development of the subject property would cause the removal of an old single-family residence which has a semicommercial, legal, nonconforming use at the present time and which, in McCann's opinion, has a deleterious effect on the Weber Lane homes.

McCann stated that the overriding character of the area is not influenced by single-family dwellings. He stated that high tension wires generally are looked upon by single-family dwellers as somewhat of a nuisance or distraction, reducing the marketability of a single-family homesite in such a setting as opposed to a homesite of comparable character that may not have the same distractions, and in some instances curtailing the ability to obtain financing for them.

McCann testified that there is a need for single-family homes in Skokie, but there is also a high demand for multiple-family units.

Thompson A. Dyke, a city and planning consultant, testified for the village. He stated that the subject property was envisioned to be used for single-family residences under the Skokie Comprehensive Plan. In his opinion plaintiffs' proposed developments are not in keeping with the Plan or the character of the immediate neighborhood and allowing either development would constitute spot zoning. Dyke stated that the trend of development in the subject area has been in accordance with the Village's

plan and indicated that the introduction of a multiple-family development into the area would establish a precedent and other requests for multiple-family developments would follow. If either of plaintiffs' proposals were allowed, Dyke believed that too many people would be placed up against the railroad on a site with inadequate access and that slum conditions could follow over a long period of time. Taking into account the existing land use of the subject property, nearby land uses, existing zoning, the suitability of the subject property for a particular use and the character and trend of development in the neighborhood and community as a whole, Dyke concluded that the highest and best use for the subject site would be as a single-family development as zoned. The Village's proposal of eight single-family homes for the site did not come within his definition of the highest and best use for the property.

On cross-examination Dyke testified that there are five zoning classifications within a city block of the subject property and that the subject property takes its character only from the single-family homes. He also stated that while Weber Lane is not incompatible with the proposed developments, the subject property is unsuitable for a multiple-family development and there are not adequate shopping and services in the area to handle the additional population that would be brought by such a development. From the subject property, Dyke said, he could see the high tension wires, the railroad, the Edens Expressway and an office building on the other side of the expressway as well as hear the noise from the Edens. These are not desirable single-family characteristics and should be avoided if possible, he noted, but these uses have been accepted by the people living in the area. Dyke also stated that there is a high demand and need for multiple-family residences in Skokie and that the Village has not pursued a zoning pattern that promotes pockets of easily accessible multiple-family developments.

Marilyn Packer, who lives at 5154 Weber Lane, adjacent to the subject property, testified on behalf of the 16 families from Weber Lane who filed as intervenors in these proceedings. She objects to the development of a multiple-family complex on the subject property because of the congestion, traffic and noise the development would generate. When she purchased her home on Weber Lane, she moved away from a townhouse development and chose to live on Weber Lane for its quietness and in reliance upon the R-1 zoning there. She would not live next door to a multiple-family development. Ms. Packer said she would have no objection if Weber Lane were opened up and the cul-de-sac extended into the subject property if eight single-family homes were built because that would be in keeping with the character of the area. On cross-examination the witness stated that she does not object to the presence of the gas regulator station and that she can see the Edens Expressway and

the high tension wires and can hear the trains from her home. She said she pays no attention to them and considers the subject property an ideal site for single-family homes.

Howard Zimmerman, a real estate appraiser, testified for the village of Skokie. He appraised the subject property as presently zoned and unimproved at $132,000. This appraisal was based upon the development of eight single-family residences on the site, the full value of the eight lots being $195,000. Public improvements were estimated at $50,000 and a 10% discount factor was included for the time necessary to develop the property. Zimmerman stated that the value of the lots was based on comparable sales of vacant real estate in the village. At the northeast corner of Enfield and Lawndale, a single-family lot sold for $16,000 in 1973. In the 8600 block on Keeler, two of three lots were sold in July 1976, at $48,000 per lot. Those lots were adjacent to the Evanston Golf Club and, according to Zimmerman, were considerably deeper than any single lot that could be developed on the subject property. Approximately one-half mile northeast of the subject site, north of Old Orchard, a lot at 10056 LaCrosse was sold for $24,500 in May, 1976. At 9630 Lawler Avenue, north of Golf Road and just west of Old Orchard, a lot sold in 1974 for $28,500. Zimmerman also testified to the appraised range of values for homes on Terminal Avenue, south of Golf Road on the west side of the railroad right-of-way. In November, 1974, a two-year old, eight room home with two bedrooms and 2½ baths, located at 9439 North Terminal, was sold for $75,000. In April 1973, a home at 5112 Weber Lane was sold for $61,500. In Zimmerman's opinion the highest and best use for the subject property would be for the development of single-family homes and there is a market for such homes. On cross-examination he stated that the sales price of single-family homes that could be built on the subject site would probably be somewhere in the range of $75,000 to $85,000. Defining highest and best use as that immediate use which would bring the most money to the property owner, Zimmerman testified that although single-family development would not be the most profitable, it is the best use for the subject property at the present time. Zimmerman also stated that the subject site is not suitable for a multiple-family development, but that there is a demand for such developments in Skokie and that multiple-family units built on the subject property could be sold.

After the testimony of the above witnesses was received, the trial court entered its final judgment order on October 29, 1976, finding that plaintiffs had overcome the presumption of the validity of the village of Skokie Zoning Ordinance and that the zoning ordinance, as applied to the subject property insofar as it prevented the use of the subject property as proposed, was "unreasonable, arbitrary, discriminatory, unconstitutional and void and bears no reasonable relationship to the public health, safety,

welfare and morals." The trial court declared that plaintiffs, or any persons claiming by, through and under them, were entitled to use the subject property for the 24-unit townhouse plan proposed by plaintiffs in compliance with the plans submitted in evidence, and enjoined defendants from interfering with such use of the subject property.

OPINION

■ ■ ■ It is the right of every property owner to use his or her property in any way, subject only to the restraint which is necessitated by the welfare of the community as a whole. (*Northern Trust Co. v. City of Chicago* (1954), 4 Ill. 2d 432, 123 N.E.2d 330.) A presumption of validity attaches to all zoning ordinances (*Jacobson v. City of Evanston* (1956), 10 Ill. 2d 61, 139 N.E.2d 205), but when it is shown that the restriction caused by an ordinance bears no reasonable relationship to the public welfare, the presumption of validity is dissipated and the ordinance falls. (*Krom v. City of Elmhurst* (1956), 8 Ill. 2d 104, 133 N.E.2d 1.) While an ordinance may be valid in its general aspects, it may be invalid as applied to a particular piece of property and the burden is upon the party challenging the enforcement of the ordinance to overcome its presumption of validity. This requires that the party prove, by clear and convincing evidence, that the application of the zoning ordinance to the subject property is arbitrary and unreasonable and bears no substantial relationship to the public health, safety and welfare. *Exchange National Bank v. County of Cook* (1962), 25 Ill. 2d 434, 185 N.E.2d 250.

It is well recognized that testimony in cases of this nature is often contradictory, thus making the credibility of witnesses of great importance. (*Northern Trust Co. v. City of Chicago.*) Therefore, a reviewing court will not overturn the findings of the trial court in this regard unless the trial court's decision is against the manifest weight of the evidence. *First National Bank v. Village of Morton Grove* (1973), 12 Ill. App. 3d 589, 299 N.E.2d 570.

Although the validity of each zoning ordinance must be determined according to its own facts and circumstances, there are certain factors which have traditionally been considered in making that determination. Those factors are set forth as guidelines in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65, and we need discuss the considerations therein only insofar as they are relevant to the instant case. Plaintiffs contend that they have satisfied the test set forth in *La Salle* and have thereby overcome the presumption of validity of the Skokie Zoning Ordinance as it applies to the subject property. They further contend that the trial court's decision was not against the manifest weight of the evidence. The defendant and intervenors, on the other hand, maintain that the subject property is suitable for the zoned purpose and

that plaintiffs have not met their burden of overcoming the presumption of validity attached to the zoning ordinance. In addition, defendant claims that plaintiffs' proposed use of the subject property constitutes spot zoning.

The uncontroverted testimony of witnesses for both parties shows that the subject property is located in an area that is a mixture of single- and multiple-family, manufacturing and commercial uses and that the site itself is bordered by several different zoning classifications and uses. Although defendant's expert witness maintains that the subject property draws its character solely from Weber Lane and the side yards of two homes adjacent to the property, on cross-examination he does admit that the surrounding area has some impact on the character of the subject property. This gives support to testimony of plaintiff's witnesses that no one particular use gives its character to the subject property and that the presence of the adjacent railroad tracks, high tension lines and gas regulator station, as well as the Edens Expressway and other high density uses in the immediate area, have a greater impact on the subject property's character than does Weber Lane alone.

■■ The character of the subject property notwithstanding, defendant contends that the subject property is suitable for single-family residential use and the zoning classification should therefore be upheld. Moreover, plaintiffs' witnesses have conceded that single-family homes can be built on the site, although not economically. However, it is not necessary that the property be totally unsuited for the use zoned in order to overcome the presumption of the ordinance's validity. It is sufficient under the *LaSalle* holding that there be a substantial loss in value of the property resulting from a classification that bears no substantial relation to the public welfare. The evidence showing a loss to plaintiffs that is unwarranted by the community's welfare is considerable.

Plaintiffs have presented expert testimony that the subject property as presently zoned is worth $60,000 and would be worth $200,000 to the plaintiffs if the proposed use were allowed. The value of the property as zoned was based on the assumption that no more than six single-family lots could be developed on the site without a zoning variation. The appraiser's assumption as to the development allowed under the existing zoning was confirmed by the architect, proposed developer and land planner who testified for the plaintiffs. Defendant's estimate of the property's value under the existing zoning is $132,000, based upon the development of eight single-family lots. Plaintiffs' estimated $200,000 value of the subject property if developed as proposed was not controverted by defendant's expert and reflects a sizeable loss to plaintiffs even if the property is developed with eight lots. If the developed property is valued at $155,000, the lowest figure of the price range in

plaintiffs' contract of sale, the loss in value of the property exceeds $30,000. The comparable sales in the area upon which defendant's estimates were based included no property which backed up to railroad tracks, or high tension wires, which was in view of the Edens Expressway or which was adjacent to manufacturing classifications. Furthermore, the $13,000 asking price for an improved lot on Weber Lane is considerably less than the $24,000 value defendant places on each of the eight lots it says can be developed on the site.

■■ Although defendant has characterized the loss in value as small, plaintiffs have shown that the extent of that loss is not necessitated by the community's welfare. The plans for the proposed developments incorporated suggestions made by the Fire Department, Public Works Department and Planning Department of the Village. Plaintiffs' several expert witnesses have testified that there would be no diminution in value and no detrimental effect to surrounding property other than that which normally attends any construction work. Plaintiffs' architect has testified that water mains, fire hydrants and storm drainage are adequately provided for in the plans. A traffic engineering consultant testified that there would be neither a significant additional traffic hazard nor significant additional traffic congestion if the proposed development were allowed. The testimony of a civil engineer was that there would be no adverse effects on the adjacent property and that the existing sewer systems and water mains are adequate to serve the proposed developments. No negative effects of the proposed development appear on the record, save for the testimony of one of the intervenors who, on behalf of all intervenors, testified that she would not live next to a multiple-family development. The likes and dislikes of neighbors, however, are relevant only as they pertain to the health, safety and welfare of the community and no such connection has been made by defendant. Moreover, experts for both plaintiffs and defendant agree that there is a demand for multiple-family units in the area and the defendant has admitted that such a development would not be incompatible with the homes on Weber Lane. Furthermore, defendant's city planning expert testified that the village's comprehensive plan has not provided for easily accessible multiple-family developments.

■■ At oral argument defendants raised the additional claim that because only the individual plaintiffs could have testified as to any attempts to sell or develop the subject property as zoned, by failing to testify they have not met their burden of proving that the land has been undeveloped due to the existing zoning. Not having been raised in defendant's brief, however, the point is considered waived. (Ill. Rev. Stat. 1977, ch. 110A, par. 341(e)(7).) Nevertheless, even if we consider

defendant's contention, the omission of such testimony is not fatal to the plaintiffs' case. The length of time the property is vacant is to be considered in the context of land development in the area. (*Krom v. City of Elmhurst.*) Furthermore, it is only one of the factors to be considered in determining the validity of the zoning ordinance, and no one factor is controlling. (*La Salle.*) The trial court, in addition to drawing any inferences from the absence of the individual plaintiffs' testimony, also had before it evidence regarding the existence of a contract for sale which was contingent upon the property being rezoned, the value of the property as zoned and the value if rezoned, the state of the site's development, and the nature of the surrounding area. The trial court was in the best position to determine the weight to be given to the evidence, or any absence thereof.

■■ We conclude that the record amply supports the trial court's finding that plaintiffs have overcome the presumption of the validity of the village of Skokie Zoning Ordinance as applied to the subject property and that the R-1 zoning classification imposed on the subject property bears no reasonable relationship to the public health, safety, welfare and morals.

Moreover, we find that plaintiffs have shown that the proposed use is reasonable. Expert witnesses for both parties have testified that the proposed use falls within the highest and best use from the standpoint of both monetary return to plaintiffs and impact on the community. In making this determination, we need not consider whether all possible intervening classifications would also be arbitrary and unconstitutional. *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406.

■■ Finally, defendants contend that the proposed use of the subject property constitutes spot zoning because it is inconsistent with the village's comprehensive plan and the nearest multiple-family dwellings are one-quarter mile away. Spot zoning is a change in zoning applied only to a small area, which is out of harmony with comprehensive planning for the good of the community. (*O'Brien v. City of Chicago* (1952), 347 Ill. App. 45, 105 N.E.2d 917; *Reskin v. City of Northlake* (1965), 55 Ill. App. 2d 184, 204 N.E.2d 600.) This definition of spot zoning has been interpreted as zoning which would violate a zoning pattern which is homogenous, compact and uniform. (*Siegel v. City of Chicago* (1970), 127 Ill. App. 2d 84, 261 N.E.2d 802.) No such situation exists here. The subject property is surrounded by several zoning classifications and uses ranging from single-family to light manufacturing. The trial court properly found that the current zoning bears no reasonable relationship to the community's benefit and we find that the proposed change in zoning

236

does not represent the kind of intrusion into a uniformly zoned area that can be considered spot zoning.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.