AMALGAMATED TRUST AND SAVINGS BANK, Trustee, *et al.*, Plaintiffs-Appellants, *v.* THE COUNTY OF COOK, Defendant-Appellee.—(THE VILLAGE OF GLENVIEW *et al.*, Intervening Defendants-Appellees.)

First District (4th Division)    No. 79-582

Opinion filed March 13, 1980.

Jack M. Siegel, of Chicago, for appellants.

Bernard Carey, State's Attorney, and Daniel M. Resnick, law student, both of Chicago (Paul P. Biebel, Morris Alexander, and James F. Henry, Assistant State's Attorneys, Frederick O. Floberg, of Ross, Hardies, O'Keefe, Babcock & Parsons, David T. Hejna, and Zachary D. Ford, of counsel), for appellees.

Mr. JUSTICE ROMITI delivered the opinion of the court:

■■ The plaintiff seeks to have a property zoned residential rezoned to permit the erection of a shopping center, office park complex, financial institution with remote drive-in facility, a cluster of restaurants, four six-story multiple-family or senior citizen towers, two five-story condominium structures, and 25 single-family homes. The trial court held that while the existing residential zoning applicable to the property was unreasonable, the proposed plan was not a reasonable use. We affirm the latter finding.

The plaintiffs, who are the owners and proposed developers of the subject property, applied to the Cook County zoning board of appeals for a rezoning of the subject property to R-8 General Residence District classification and for a special use for a planned unit development. The zoning board of appeals recommended denial of the application and the board of commissioners concurred. The plaintiffs filed a suit against Cook County seeking a declaration that the zoning ordinance was unconstitutional as applied to the subject property and an injunction barring Cook County from preventing the development of the property as planned. The villages of Glenview and Northbrook which are contiguous to the property on the south and west, respectively, and La Salceda Homeowners Association, an organization of property owners owning land to the west of the property, were permitted to intervene. After a bench trial, the trial court found the existing classification arbitrary, capricious and unreasonable, but held that the uses planned by the plaintiff for the subject property represented "a tremendous conglomerate of maximums," were not reasonable and upheld the denial of the special use permit.

### THE PROPERTY AND SURROUNDING AREA

The evidence in this case discloses that the subject property is an approximately 36.2-acre plot of level, slightly sloping vacant land with frontage of approximately one-quarter of a mile along Willow Road to the north and approximately one-eighth of a mile along Shermer Road on the east in Northfield Township, in an unincorporated area of Cook County. The property is roughly square except for a portion of the southeast corner, which is traversed by the Chicago & Northwestern Railroad.

The subject property is currently zoned R-4 (single-family residences) under the Cook County Zoning Ordinance of 1976, which requires 20,000-square-foot lots. The village of Northbrook, village of Glenview, Northfield Township, and Cook County all have adopted official comprehensive plans showing the subject property as a single-family use. Northbrook shows 12,000-square-foot minimum lots, in

accordance with the Northbrook R-4 classification, while Glenview shows 10,000-square-foot lots, in accordance with its R-4 classification. The Northfield Township plan, updated in 1974, identifies the property as a single-family use and park site.

Immediately west of the subject property are single-family homes in the La Salceda development in Northbrook. These homes, developed under the Northbrook R-4 single-family 12,000-square-foot minimum lot classification, range in value from $160,000 to $225,000. The homes do not front on Willow Road, but on interior streets. Several, however, side or back on Willow. Immediately south of the western half of the property, and also to the southwest of it is the village of Glenviews's R-4 single-family Willow Development which requires 10,000-square-foot minimum lots. The values of those homes are in the same range as those in La Salceda.

Further west, on the south side of Willow in Northbrook, is the Cobblestone development. Although originally approved for 60% single-family, 40% townhouses, the market did not sustain the multifamily units, and only three triples and seven duplexes were built, all in the early years. All recent construction in Cobblestone has been single-family, apparently representing the trend of development in the area. West of Cobblestone, along the south side of Willow, are several other new single-family developments. Greenwood Avenue, which crosses Willow about 1300 feet west of the subject property at signalized intersections, has single-family homes on the south corner and multifamily to the north. Besides the few multifamily units in Cobblestone, the only exception to the single-family development on the south side of Willow, west of Shermer, is the Plaza Del Prado Shopping Center, imposed by judicial decree (*Hutson v. County of Cook* (1974), 17 Ill. App. 3d 195, 308 N.E.2d 65, *appeal denied* (1974), 56 Ill. 2d 582), located at the corner of Willow and Pfingsten about three-quarters of a mile west of the subject property. The decree which approved the Plaza Del Prado also required that a parcel south of the shopping center be developed with 25 single-family homes separated by a 20- to 25-foot landscape buffer plus about a 6-foot stockade fence.

On the north side of Willow, northwest of the subject property, is the Salceda Del Norte development which is entirely residential, consisting of townhouses and multifamily buildings. The maximum density permitted is six units per acre. West of this are 4-plexes, 6-plexes and single-family units. Further west on Willow is Stone Hedge, a large development currently under construction which is completely single-family. It is described as "wrapping around" St. Peters Church and a nursery located at the northeast corner of Pfingsten and Willow. Further west on Willow,

past Landwehr Road, a relatively large scale single-family development is being constructed.

Directly north of the subject site, on the north side of Willow, is a 17.9-acre parcel zoned by judicial decree (*Northbrook Trust & Savings Bank v. County of Cook* (1977), 47 Ill. App. 3d 879, 365 N.E.2d 433, *cert. denied sub nom. Village of Northbrook v. Northbrook Trust and Savings Bank* (1978), 434 U.S. 1069, 55 L. Ed. 2d 771, 98 S. Ct. 1249), for a combination K-Mart Shopping Center and multifamily developments. Despite that decision, none of these have yet been built and the property is currently used as a nursery. The multifamily buildings planned for that development will be three stories high and have a maximum density of 10 units per acre. The northwest corner of Willow and Shermer is used for a filling station. North of the K-Mart property is part of Salceda Del Norte.

About a mile north, near the center of Northbrook, is an area zoned R-7 which permits a density of 17 dwelling units per acre. On the east side of Shermer, slightly north of the K-Mart property, is a United Parcel Service distribution center. On the northeast corner of Shermer and Willow is a filling station and car wash. Directly east of the subject property is a triangle bounded by Shermer on the west, Willow on the north and the railroad. This triangle is developed with a small convenience shopping center. A witness for the defense testified that the area did not determine the character of use of the subject property although it might affect the design of any construction on the property.

The Chicago & Northwestern Railroad traverses a portion of the southeast corner of the subject property and continues northeast across Shermer and then across Willow. To the south and east of the railroad is an area of industrial uses, the Glenview Naval Air Station, two cemeteries, and a few scattered residences. The railroad embankment is 15 to 20 feet high. Witnesses for both parties agreed that it was a natural and physical barrier. However, it was noted traffic to the industrial sites passes the subject property.

Shermer Road in this area is a four-lane divided highway. A defense witness testified that it has become a demarcation line because of zoning practices (residential on the west, manufacturing on the east). A witness for the plaintiff testified that Shermer is not a natural boundary.

Willow Road is a divided four-lane arterial roadway located on a 100-foot right-of-way; it widens to essentially six lanes at the intersection with Shermer. The average traffic crossing over the highway is approximately 35,000 vehicles a day. The defendants' witness testified that it forms a natural barrier and that buildings on the north of Willow would have only a little effect on the subject property; they would affect, at most, the design but not the use of the property. One of the plaintiffs' witnesses agreed that Willow Road had been used as a zoning line of demarcation,

but felt that the south side of Willow should have been developed more intensely. He also testified that the property took a commercial character from the Willow-Shermer intersection. The trial court found that Willow, Shermer and the railroad embankment are natural, recognizable and proper zoning barriers.

There have been two serious train derailments at the Shermer viaduct during the last 10 years. The cars fell off the viaduct into Shermer Road. The railroad track is little more than a boxcar length from one of the proposed condominiums. One of the defense witnesses testified this was one factor favoring single-family as opposed to multifamily development. Furthermore, although the subject property is not technically within a danger zone with respect to the Naval Air Station, the Station has taken an official position against development of the property for multifamily uses.

### The Proposed Development

The plaintiffs wish to build a $25 million development on the subject property, including a shopping center, an office park complex, a financial institution with remote drive-in facility, a cluster of restaurants, four six-story multiple-family or senior citizen towers, two five-story condominium structures, containing a total number of 306 apartment and condominium units, and 25 single-family homes. Of the 36.2 acres on the site, 16.2 would be devoted to commercial and office uses. The business and commercial buildings would occupy the northern half of the property. The condominiums would occupy the eastern portion of the property south of the commercial near the railroad. The multiple-family buildings would occupy the southeastern quarter of the property. One of those buildings would also be very near the railroad tracks. The single-family homes would be located along three-quarters of the western border of the property (that quarter nearest Willow being for offices).

There would be two parking stalls for each dwelling unit. The parking structure for the multifamily units would rise 2½ stories above ground level. One hundred and twenty of the condominium parking stalls would be indoors, with the remainder beside the buildings. There would also be parking for the commercial and office areas.

The number of new permanent residents at the site would be 681, while the total number including those at the commercial and office facilities, for planning and engineering purposes, would be 1365. The density within the multifamily area, including 1.6 acres designated to remain vacant for storm-water retention, would be approximately 33.9 units per acre. The overall density of the multifamily and condominium buildings, plus the retention area, would be 29.4 units per acre.

Considering as well the area designated for single-family units, the overall density would be 16.96 dwelling units per acre.

The plan calls for a 125-foot-high water storage tank (approximately 14 stories tall), with a capacity of 250,000 gallons located in the center of the property immediately to the east of existing single-family homes, and on the common line between the commercial and multifamily developments.

There was conflicting testimony as to whether the proposed water storage and storm water systems were adequate. The trial court in its opinion noted that it considered the evidence that there was no alternative water supply available to the project, as planned, in the event of a prolonged emergency or shut down, especially in light of the project's proposed housing for the elderly.

### IMPACT OF PROPOSED PROJECT

It was estimated that the total number of vehicle trips on Willow generated by the proposed development would be between 10,000 to 15,000 per day, even more if the restaurants were developed as fast-food restaurants. The plan provides for three major entrances to the site off of Willow Road. One entrance would have a signalized left turn for west-bound traffic approximately 740 feet west of the existing signalized stop at Shermer. A traffic consulting engineer who testified for the plaintiffs admitted that there would be a potential problem for vehicles entering right onto Willow, desiring to turn left to go north on Shermer. Other improvements to the Willow-Shermer intersection would include a continuous right-turn lane for east-bound traffic on Willow along the frontage of the property for all three Willow entrances to the site. There would also be two entrances off Shermer, and a concrete median constructed on Shermer. The left-turn lanes at Willow and Shermer in both the east-bound and west-bound directions would be lengthened, and a right-turn lane added to Willow for west-bound cars turning north on Shermer. Plaintiffs' witness testified that the present traffic flow and safety of the site would be improved.

There was also testimony that the development would eventually benefit the school system because of tax revenues. Likewise, there was testimony the development would have a very positive fiscal and economic impact upon the local community at large.

The six-story multifamily structures would be visible from existing single-family homes that abut the subject property. The nearest multifamily building would be approximately 100 feet from the rear lot line of the closest single-family home, and no buffer is provided. The 14-story elevated water storage tank would cause additional visual pollution, in the opinion of a city planner who testified for the defendants. The

office complex, consisting of three two-story buildings, would be 80 feet from the nearest single-family property lines to the west. Between them there would be a 4-foot berm and a 30-foot landscaped buffer. A service drive would extend behind the food stores, drug stores and hardware stores, thereby placing all of the trucks and service vehicles at the center of the site. In the opinion of one witness, the service drive would end in a corner, formed by the food and retail buildings, which would amplify the truck noise "like an echo chamber." He was of the opinion, as a land planner, that the proposed development was extremely intense, and not characteristic of similar developments in this Glenview-Northbrook neighborhood. He felt that thrusting the commercial development onto the site would have an adverse effect on the surrounding single-family homes in La Salceda and the Willows, and that the six-story multifamily buildings would reduce their privacy. He also objected to placement of the multifamily buildings in the backyard of the commercial buildings. A real estate appraiser and consultant who testified for the defendants also was of the opinion that the development would detract from the value of the existing single-family homes.

Plaintiffs' architect testified that from an architectural standpoint the proposed development would enhance the surrounding area because of the open space. However, he conceded that the five-story design was based on economic and engineering considerations and not on considerations as to impact on the surrounding area. Another witness testified for the plaintiffs that the character of the proposed commercial development would substantially help to upgrade the character of the existing commercial development, and a third testified that the proposed development would have no measurable detrimental effect on surrounding values.

Several owners of single-family homes adjacent to the subject property testified that they had relied on the single-family zoning of that property when they purchased their own lots; that they would not have purchased their own lots had the subject property not been zoned residential; that they found the proposed development highly objectionable; and that it would depreciate the value of their property.

An economic consultant testified for the plaintiffs that the stores would meet a definite community need, that there was a high market potential for the condominiums and that the apartments would rent out over a period of 1½ years. Defendants' witnesses testified that there was no need for the planned commercial development. According to Glenview's village manager, its population at the time of the trial was 32,000 and anticipated 1980 population was 33,000. About three-quarters of a mile west of the subject property is the Plaza Del Prado Shopping Center. Across Willow from the subject property is the proposed K-Mart

Shopping Center. Across Shermer from the subject property is a strip-type shopping center. The downtown areas of Northbrook and Glenview are about two to three miles from the property.

## HIGHEST AND BEST USE

Two of the plaintiffs' experts testified that the proposed development would be the "highest and best use" of the property. On cross-examination one of the witnesses was unable to say how much of the commercial area could be reduced and still fit within his definition of highest and best use, noting that there were an infinite number of ways the property could be developed.

Three of the defendants' experts testified that the proposed development would not be the highest and best use. The first was of the opinion that the highest and best use of the subject property was residential, but could include some townhome clusters or low-rise multifamily, but no high-rise structures. He stated that the R-4, 20,000-square-foot lot requirement was not the highest and best use, but felt 12,000 or 10,000 square feet would be appropriate. The second expert was of the opinion that the highest and best use of the subject property was single-family residential with a neighborhood park on the southern end. He would design a berm or wall to screen Willow Road. The third expert witness for the defendants testified that the proposed development was not the highest and best use because the proximity of the proposed office complex to the existing single-family homes would detract from their value.

## ECONOMIC LOSS

The subject property has not been listed for sale within the past 10 years. The record is barren of any attempt to offer the property for development as zoned, or to seek rezoning for an intermediate use. The record also does not disclose what the owner paid for the property.

There was testimony that the property as zoned would have a market value of between $1,100,000 and $1,629,000. If zoned for 10,000-square-foot lots, it would have a market value of $2,353,000. If the proposed development were permitted on the subject property, the market value of the land would rise to about $2,900,000.

## I.

The defendants have not appealed the trial court's ruling that the R-4, 20,000-square-foot zoning ordinance was unreasonable. Nevertheless, we must note that it is well established in Illinois that the court is only properly concerned with validity of the zoning ordinance insofar as it prohibits the proposed use and if the plaintiff fails to prove the proposed use reasonable, the court need not consider the validity of the ordinance.

(*Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 289 N.E.2d 614; *Finfrock v. City of Urbana* (1976), 39 Ill. App. 3d 641, 349 N.E.2d 491.) Accordingly, despite the defendants' failure to appeal, the plaintiffs did not carry their burden in this case merely by establishing that the existing residential classification was unreasonable, since they were required to prove that their proposed use of the property was reasonable. (*Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 289 N.E.2d 614; *Johnston v. City of Geneva* (1976), 37 Ill. App. 3d 578, 346 N.E.2d 444; *Mangel & Co. v. Village of Wilmette* (1969), 115 Ill. App. 2d 383, 253 N.E.2d 9.) As stated in *Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 234-35, 311 N.E.2d 268, 277-78, *cert. denied* (1975), 420 U.S. 929, 43 L. Ed. 2d 401, 95 S. Ct. 1130:

"The instant case is strikingly similar in its procedural posture to the recent Illinois Supreme Court case of *Schultz v. Village of Lisle*, 53 Ill. 2d 39, 42, 289 N.E.2d 614. There plaintiffs filed a declaratory judgment action praying that the Village's zoning ordinance be declared void and ineffective to prevent plaintiffs from developing their property for an automobile service station, after this relief was denied by the Village Board. Between the zoning classification that applied to plaintiffs' property and the classification plaintiffs sought were several intervening classifications, as is also true of the instant case. In *Schultz* the witnesses for the Village admitted that the proper classification of the property was not for single-family residences, but that the property should retain a residential classification. So too in the instant case defendants in their brief admit that their 'experts agree that the R-3 classification is too restrictive and are uniform in their opinions that R-4 single family residential would be the highest and best use of the property.' The court in *Schultz* then went on to state the issue before it and the standard to be applied as:

'In this case we need not reach the question of the validity of the zoning ordinance generally as it relates to plaintiffs' property. The declaratory relief sought is that the ordinance is void insofar as it prohibits the proposed use of the property for a gasoline service station. This court has held that it is appropriate to frame the decree with reference to the record before it, and the zoning ordinance may be set aside only to the extent necessary to permit the specific use proposed. [Citations.]

Although the undisputed testimony may indicate that the proper classification of plaintiffs' property is either "B" Residence or "C" Residence rather than "A" Residence, we need not decide whether the zoning ordinance as it relates to plaintiffs' property is for this reason invalid because none

of these three classifications permit the use of property for a gasoline service station. *The question which was presented to the trial court and which is before this court is the reasonableness of permitting the requested use of plaintiffs' property. In testing the validity of the zoning ordinance in this case we are only concerned with the validity of the ordinance insofar as it prohibits this proposed use. The general rules, of course, apply, in that the person attacking the ordinance must prove by clear and convincing evidence that the zoning ordinance is, as to him, arbitrary and unreasonable and without substantial relation to public health, safety, morals, or welfare.* [Citations.]' (Emphasis supplied.)

In the instant case none of the intervening classifications permits the proposed use. Plaintiffs therefore have the same burden of overcoming the presumption of validity by clear and convincing evidence as did the plaintiffs in *Schultz*."

◼◼◼ In light of *Schultz* and *Littlestone*, while a plaintiff who has proven that the proposed use is reasonable need not also prove that all possible intervening classifications would be arbitrary and unconstitutional (*Chicago Title & Trust Co. v. Village of Skokie* (1978), 60 Ill. App. 3d 221, 376 N.E.2d 313; *Brunette v. County of McHenry* (1977), 48 Ill. App. 3d 396, 363 N.E.2d 122, but see *First National Bank v. Village of Northbrook* (1971), 2 Ill. App. 3d 1082, 278 N.E.2d 533; *First National Bank v. County of Cook* (1977), 46 Ill. App. 3d 677, 360 N.E.2d 1377), it cannot be said that such classifications are totally irrelevant. Furthermore, as we held in *Pillman v. Village of Northbrook* (1978), 65 Ill. App. 3d 40, 382 N.E.2d 399, a proposed zoning plan, if reasonable, may be a factor in determining whether the proposed use is an appropriate use of the subject premises. This is true even though the plan is that of the neighboring municipality, which may annex, but has not yet annexed, the property. Such municipalities not only have the right but the duty to concern themselves with the development of such property. *La Salle National Bank v. County of Cook* (1977), 52 Ill. App. 3d 76, 367 N.E.2d 131, *appeal denied* (1978), 67 Ill. 2d 592.

In short, since we are governed by *Schultz*, it is immaterial whether the 20,000-square-foot limitation is too restrictive and some other residential classification would be more appropriate. Despite the ruling of the trial court that the limitation was unreasonable, the sole issue before us is whether the zoning ordinance is unreasonable in prohibiting the proposed use. Likewise, we cannot determine if some of the proposed use would be reasonable; the plan must be considered as an unalterable whole.

## II.

The factors that the court will consider in passing on the validity of a zoning ordinance and the reasonableness of a proposed use have been repeated time and time again (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 324 N.E.2d 406; *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65; *Haws v. Village of Hinsdale* (1979), 68 Ill. App. 3d 226, 386 N.E.2d 122, *appeal denied* (1979), 75 Ill. 2d 590; *Georgen v. Village of Mount Prospect* (1978), 65 Ill. App. 3d 512, 382 N.E.2d 523, *appeal denied* (1979), 72 Ill. 2d 582; *Pillman v. Village of Northbrook* (1978), 65 Ill. App. 3d 40, 382 N.E.2d 399; *Du Page Trust Co. v. Village of Glen Ellyn* (1978), 60 Ill. App. 3d 409, 376 N.E.2d 1049; *Kluse v. City of Calumet City* (1977), 55 Ill. App. 3d 403, 371 N.E.2d 61; *Meyer Material Co. v. County of Will* (1977), 51 Ill. App. 3d 821, 366 N.E.2d 1149, *appeal denied* (1977), 66 Ill. 2d 639; *Fairfield Savings & Loan Association v. City of Chicago* (1976), 45 Ill. App. 3d 266, 359 N.E.2d 1040, *appeal denied* (1977), 66 Ill. 2d 625; *Zenith Radio Corp. v. Village of Mount Prospect* (1973), 15 Ill. App. 3d 587, 304 N.E.2d 754, *appeal denied* (1974), 55 Ill. 2d 604), and need not be repeated here. Considering these factors and the evidence, it is clear that the court did not err in ruling that the proposed use was not reasonable.

Of paramount importance is whether the restrictions imposed on the property are in conformity with the uses and zoning of nearby property. (*Kluse v. City of Calumet City* (1977), 55 Ill. App. 3d 403, 371 N.E.2d 61; *Du Page Trust Co. v. County of Du Page* (1975), 31 Ill. App. 3d 993, 335 N.E.2d 61; *Manger v. City of Chicago* (1970), 121 Ill. App. 2d 358, 257 N.E.2d 473.) The property here takes its character from the residential property on its south and west. While there are a few business uses located across Willow and some commercial uses across the railroad, both the roads, being heavily travelled, high-speed highways (*Fairfield Savings & Loan Association v. City of Chicago* (1976), 45 Ill. App. 3d 266, 359 N.E.2d 1040, *appeal denied* (1977), 66 Ill. 2d 625; *Du Page Trust Co. v. County of Du Page* (1975), 31 Ill. App. 3d 993, 335 N.E.2d 61; *Padgett v. City of Oakbrook Terrace* (1967), 89 Ill. App. 2d 244, 231 N.E.2d 466), and the railroad (*Urann v. Village of Hinsdale* (1964), 30 Ill. 2d 170, 195 N.E.2d 643; *Manger v. City of Chicago* (1970), 121 Ill. App. 2d 358, 257 N.E.2d 473; *Chicago & Northwestern Railway Co. v. City of Des Plaines* (1968), 97 Ill. App. 2d 201, 240 N.E.2d 280), act, as the trial court found, as buffers, and constitute reasonable lines of demarcation between residential and other uses. Accordingly, the few businesses across Willow and the commercial uses on the other side of the railroad can be considered to have little or no influence on plaintiffs' property. (*Du Page Trust Co. v. County of Du Page* (1975), 31 Ill. App. 3d 993, 335 N.E.2d 61.) The

presence of less restricted areas across a street do not make restrictions unreasonable (*Lapkus Builders, Inc. v. City of Chicago* (1964), 30 Ill. 2d 304, 196 N.E.2d 682), and the fact that there are commercial uses nearby or even across the street does not make a residential zoning unreasonable or capricious (*Georgen v. Village of Mount Prospect* (1978), 65 Ill. App. 3d 512, 382 N.E.2d 523, *appeal denied* (1979), 72 Ill. 2d 582; *Fairfield Savings & Loan Association v. City of Chicago* (1976), 45 Ill. App. 3d 266, 359 N.E.2d 1040, *appeal denied* (1977), 66 Ill. 2d 625; *First National Bank v. City of Springfield* (1976), 42 Ill. App. 3d 566, 356 N.E.2d 367). Likewise, the mere fact that busy highways run alongside the plaintiffs' property does not show it to be unsuitable for residential use. (*Du Page Trust Co. v. County of Du Page* (1975), 31 Ill. App. 3d 993, 335 N.E.2d 61.) It has often been held that the fact that property is located upon a main traffic artery does not invalidate a zoning ordinance which restricts its use to residential purposes. (*Fairfield Savings & Loan Association v. City of Chicago* (1976), 45 Ill. App. 3d 266, 359 N.E.2d 1040, *appeal denied* (1977), 66 Ill. 2d 625; *Doherty v. City of Des Plaines* (1976), 43 Ill. App. 3d 642, 357 N.E.2d 140, *appeal denied* (1977), 65 Ill. 2d 577; *First National Bank v. City of Springfield* (1976), 42 Ill. App. 3d 566, 356 N.E.2d 367.) And a combination of arterial streets and commercial uses (*First National Bank v. City of Springfield* (1976), 42 Ill. App. 3d 566, 356 N.E.2d 367), or of railroad tracks and industrial uses nearby (*Urann v. Village of Hinsdale* (1964), 30 Ill. 2d 170, 195 N.E.2d 643), does not render a residential classification invalid. Zoning must begin and end somewhere. *Lapkus Builders, Inc. v. City of Chicago* (1964), 30 Ill. 2d 304, 196 N.E.2d 682; *Bennett v. City of Chicago* (1962), 24 Ill. 2d 270, 181 N.E.2d 96; *Heller v. City of Chicago* (1979), 69 Ill. App. 3d 815, 387 N.E.2d 745; *Doherty v. City of Des Plaines* (1976), 43 Ill. App. 3d 642, 357 N.E.2d 140, *appeal denied* (1977), 65 Ill. 2d 577.

## III.

Furthermore, the evidence reveals that the project would have an adverse effect both on neighboring properties and on the community. The rights of adjacent and abutting property owners are to be considered (*Kluse v. City of Calumet City* (1977), 55 Ill. App. 3d 403, 371 N.E.2d 61), and such property owners who purchased their property in reliance upon the zoning restrictions, as the owners here testified that they did, are entitled to rely upon the precept that the classification will not be changed unless the change is required for the public good (*Urann v. Village of Hinsdale* (1964), 30 Ill. 2d 170, 195 N.E.2d 643; *Ward v. County of Cook* (1979), 68 Ill. App. 3d 563, 386 N.E.2d 309; *Kluse v. City of Calumet City* (1977), 55 Ill. App. 3d 403, 371 N.E.2d 61; *Du Page Trust Co. v. County of Du Page* (1975), 31 Ill. App. 3d 993, 335 N.E.2d 61; *Chicago &*

*Northwestern Railway Co. v. City of Des Plaines* (1968), 97 Ill. App. 2d 201, 240 N.E.2d 280). Indeed, this consideration is one of crucial importance. (*Ward v. County of Cook* (1979), 68 Ill. App. 3d 563, 386 N.E.2d 309.) The neighbors objected to the planned development because of the additional traffic and people, the accompanying noise and invasion of privacy, the destruction of their view, and the depreciation in value the development might cause to their homes. They were also concerned about the safety of the children. Density is a legitimate concern in a zoning case and an adequate basis for classification (*Hoekstra v. City of Wheaton* (1975), 25 Ill. App. 3d 794, 323 N.E.2d 124, *appeal denied* (1975), 58 Ill. 2d 596), and a municipality may reasonably restrict increases in population density where necessary for health, safety and welfare (*Continental Homes of Chicago, Inc. v. County of Lake* (1976), 37 Ill. App. 3d 727, 346 N.E.2d 226, *appeal denied* (1976), 63 Ill. 2d 555). Residents of an area are entitled to the lower density requirements which directly relate to their health, safety and morals. (*Heller v. City of Chicago* (1979), 69 Ill. App. 3d 815, 387 N.E.2d 745.) Moreover, the proposed use here would be of a far heavier density than other nearby uses and would thus be incongruous with existing uses. *Mangel & Co. v. Village of Wilmette* (1969), 115 Ill. App. 2d 383, 253 N.E.2d 9.

■ Furthermore, we have adopted the modern view that aesthetic factors such as the aesthetic enjoyment of one's home do have a significant bearing on zoning. (*Ward v. County of Cook* (1979), 68 Ill. App. 3d 563, 386 N.E.2d 309.) Even ignoring the added population, traffic and noise, it can hardly be said that the building of a 125-foot water tower is conducive to the neighbors' enjoyment of their property. Indeed, even the six-story apartment houses are a drastic alteration of the area since even the proposed multifamily buildings across Willow will only be three stories high, and the buildings on the south side of Willow are, with the exception of a few townhouses, all single-family for three-quarters of a mile west of the property. Compare *Manger v. City of Chicago* (1970), 121 Ill. App. 2d 358, 257 N.E.2d 473.

■ There was also testimony that the traffic on Willow would be greatly increased by the development and that there would be a potential problem for vehicles entering right on to Willow desiring to turn left on to Shermer. While the general increase of traffic is not given great weight, the creation of a particular traffic problem connected to a particular use at a particular location could be in and of itself a sufficient reason for the denial of that use at that location. (*Haws v. Village of Hinsdale* (1979), 68 Ill. App. 3d 226, 386 N.E.2d 122, *appeal denied* (1979), 75 Ill. 2d 590.) One of the important purposes of zoning is the alleviation of traffic congestion. *Forestview Homeowners Association, Inc. v. County of Cook* (1974), 18 Ill. App. 3d 230, 309 N.E.2d 763.

## IV.

The plaintiffs point out that the difference between the value of the property as presently zoned and the value it would have for the proposed use is substantial. However, there is commonly a substantial valuation differential in zoning cases and this is not in itself decisive. (*Heller v. City of Chicago* (1979), 69 Ill. App. 3d 815, 387 N.E.2d 745; *Kluse v. City of Calumet City* (1977), 55 Ill. App. 3d 403, 371 N.E.2d 61; *Meyer Material Co. v. County of Will* (1977), 51 Ill. App. 3d 821, 366 N.E.2d 1149, *appeal denied* (1977), 66 Ill. 2d 639; *Doherty v. City of Des Plaines* (1976), 43 Ill. App. 3d 642, 357 N.E.2d 140, *appeal denied* (1977), 65 Ill. 2d 577; *First National Bank v. City of Springfield* (1976), 42 Ill. App. 3d 566, 356 N.E.2d 367; *Du Page Trust Co. v. County of Du Page* (1975), 31 Ill. App. 3d 993, 335 N.E.2d 61.) Additionally, the difference between the value the property would have for the proposed use and the value it would have for the use conceded by the defendants to be proper (10,000-square-foot residential lots) is much less substantial. This is not a case where the plaintiffs are unable to use the property profitably. Their only hardship is that they are unable to realize as great a profit as they would like. Compare *Parkway Bank & Trust Co. v. County of Lake* (1979), 71 Ill. App. 3d 421, 389 N.E.2d 882; *Heller v. City of Chicago* (1979), 69 Ill. App. 3d 815, 387 N.E.2d 745.

The plaintiffs have also pointed out that the property has remained vacant for a long period of time. However, this does not bolster the plaintiffs' cause since the evidence shows that they have not attempted to sell or develop the subject property for the zoned uses or endeavored to obtain a less restrictive residential zoning and develop it for that use. (*Georgen v. Village of Mount Prospect* (1978), 65 Ill. App. 3d 512, 382 N.E.2d 523; *Du Page Trust Co. v. Village of Glen Ellyn* (1978), 60 Ill. App. 3d 409, 376 N.E.2d 1049; *La Salle National Bank v. County of Cook* (1977), 52 Ill. App. 3d 76, 367 N.E.2d 131, *appeal denied* (1978), 67 Ill. 2d 592.) One relying on the length of time the property has remained vacant must establish that the property is unsaleable, vacant or undeveloped because of the zoning classification. Absent such proof, we would have no more reason to hold the vacancy of the property was occasioned by improper zoning than we would to hold that the vacancy occurred because no attempts were made to use or develop the property, or because other difficulties totally unrelated to zoning had been encountered. (*Western National Bank v. Village of Downers Grove* (1970), 122 Ill. App. 2d 107, 257 N.E.2d 803.) Vacant property is often permitted to remain undeveloped in anticipation that a rezoning will enhance its value, and thus there is no inclination to sell or develop it as zoned. *Manger v. City of Chicago* (1970), 121 Ill. App. 2d 358, 257 N.E.2d 473.

## V.

■■ The plaintiffs have relied upon *Northbrook Trust & Savings Bank v. County of Cook* (1977), 47 Ill. App. 3d 879, 365 N.E.2d 433, *cert. denied sub nom. Village of Northbrook v. Northbrook Trust and Savings Bank* (1978), 434 U.S. 1069, 55 L. Ed. 2d 771, 98 S. Ct. 1249; and *Hutson v. County of Cook* (1974), 17 Ill. App. 3d 195, 308 N.E.2d 65, *appeal denied* (1974), 56 Ill. 2d 582, which invalidated residential zoning on the K-Mart property across the road from the subject property and the Del Prado property three-quarters of a mile away respectively. Suffice it to say that each case must be decided upon its own facts. (*Marquette National Bank v. County of Cook* (1962), 24 Ill. 2d 497, 182 N.E.2d 147; *Chicago Title & Trust Co. v. Village of Skokie* (1978), 61 Ill. App. 3d 219, 377 N.E.2d 1253; *Kluse v. City of Calumet City* (1977), 55 Ill. App. 3d 403, 371 N.E.2d 61; *Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 311 N.E.2d 268, *cert. denied* (1975), 420 U.S. 929, 43 L. Ed. 2d 401, 95 S. Ct. 1130.) The project proposed here is of a much more radical nature than that proposed in either of the other two cases and, as we noted earlier, the sole issue in this case is whether the prohibition of the particular proposed use is reasonable. The location is different; the buildings surrounding it are different. There are new residential developments in the area reinforcing the character as residential.

## VI.

Finally, we are constrained to note that a change in the zoning would permit an encroachment of business and multifamily uses upon an otherwise solidly residential area, and which could then in turn and with equal reason be relied upon in the future as justification for additional zoning changes in this residential area just as the *Northbrook* case was relied upon here. (*Manger v. City of Chicago* (1970), 121 Ill. App. 2d 358, 257 N.E.2d 473.) Plaintiffs' expert's testimony that the area south of Willow should have been developed more intensely signals the danger that a holding in favor of the plaintiffs in this case would open the door to further attacks in the future and by attrition threaten the continued existence of single-family residences in the area. (*Heller v. City of Chicago* (1979), 69 Ill. App. 3d 815, 387 N.E.2d 745.) As the court remarked in *Zenith Radio Corp. v. Village of Mt. Prospect* (1973), 15 Ill. App. 3d 587, 595-96, 304 N.E.2d 754, 761, *appeal denied* (1974), 55 Ill. 2d 604:

"Moreover, as stated in *Mid-West Emery Freight System Inc. v. City of Chicago*, 120 Ill. App. 2d 425, 439, 440, 257 N.E.2d 127:

' "[T]he mere presence of buildings or areas being put to use to which the person attacking the validity of a zoning ordinance seeks to put his property, is a wholly insufficient

circumstance to show that the ordinance was invalid or discriminatory as to the property of the one assailing the ordinance. * * * Appellant's contention that it is unreasonable to allow a commercial classification to a neighbor, and deny the same classification to their property, would lead to a conclusion that an entire residential area could be progressively rezoned until the whole area was commercialized." '

Although we may not necessarily conclude that the ultimate result of rezoning is as the court in *Mid-West Emery* portends, we believe that the maintenance of residential integrity, pursuant to a comprehensive plan, should be afforded recognition. The fixing of boundary lines, unless arbitrary or capricious, is a matter of legislative judgment, which courts will respect. Necessarily, residential property immediately abutting the line will be less valuable than property more remote from the boundary of a commercial zone (*DeBartolo, supra*). But that affords no justification for the constant erosion of such boundaries, *Bolger v. Village of Mt. Prospect*, 10 Ill. 2d 596, 603, 141 N.E.2d 22."

Judgment affirmed.

LINN, P. J., and JOHNSON, J., concur.